IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT
2013-5093

CMS CONTRACT MANAGEMENT SERVICES,
THE HOUSING AUTHORITY OF THE CITY OF BREMERTON,
NATIONAL HOUSING COMPLIANCE,
ASSISTED HOUSING SERVICES CORP.,
NORTH TAMPA HOUSING DEVELOPMENT CORP.,
CALIFORNIA AFFORDABLE HOUSING INITIATIVES, INC.,
SOUTHWEST HOUSING COMPLIANCE CORPORATION,
and NAVIGATE AFFORDABLE HOUSING PARTNERS
(formerly known as Jefferson County Assisted Housing Corporation),

Plaintiffs-Appellants,

and

MASSACHUSETTS HOUSING FINANCE AGENCY,

Plaintiff,

v.

UNITED STATES,

Defendant-Appellee.

Appeal from the United States Court of Federal Claims in consolidated case
Nos. 12-CV-0852, 12-CV-0853, 12-CV-0862, 12-CV-0864, and 12-CV-0869,
Judge Thomas C. Wheeler.
_____

PLAINTIFFS-APPELLANTS' OPENING BRIEF
_____

Michael J. Schaengold
Robert K. Tompkins
Elizabeth M. Gill
Patton Boggs LLP
2550 M Street, N.W.
Washington, D.C. 20037
(202) 457-6523
Counsel for Plaintiffs-Appellants

June 7, 2013

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

**CERTIFICATE OF INTEREST**
**CMS CONTRACT MANAGEMENT v. US, 2013-5093**

Counsel for the Plaintiffs-Appellants certifies the following:

1.    The full name of every party represented by me is:

Navigate Affordable Housing Partners, Inc. (formerly known as Jefferson County Assisted Housing Corporation).

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

The real party in interest represented by me is Navigate Affordable Housing Partners, Inc. (formerly known as Jefferson County Assisted Housing Corporation).

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:

Navigate Affordable Housing Partners, Inc. is an instrumentality of the Jefferson County Public Housing Authority.  No publicly-held corporation owns 10 percent or more of its stock.

4.    The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or agency or are expected to appear in this court are:

Patton Boggs, LLP
Michael J. Schaengold, Robert K. Tompkins, Elizabeth M. Gill, Trevor R. Tullius


s/ Michael J. Schaengold
Michael J. Schaengold

Dated:  June 7, 2013

Form 9

FORM 9. Certificate of Interest

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

CMS Contract Management Services, et al. v. The United States of America

No. 2013-5093

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

Apellant CMS Contract Management Services certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:

CMS Contract Management Services;
The Housing Authority of the City of Bremerton

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

CMS Contract Management Services;
The Housing Authority of the City of Bremerton

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Pursuant to FRAP 26.1(a), Contract Management Services ("CMS") submits this Disclosure statement, and hereby states that CMS does not have a parent corporation, and that there is no publicly held corporation owning 10% or more of CMS stock. CMS is a non-profit instrumentality of the Housing Authority of the City of Bremerton, a municipal entity.

4. ☑  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Colm P. Nelson - Belcher Swanson Law Firm, PLLC
William Gregory Guedel - Foster Pepper PLLC

June 6, 2013
_____
Date

_____
Signature of counsel
Colm P. Nelson
_____
Printed name of counsel

Please Note: All questions must be answered
cc: _____

124

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST
## CMS Contract Management v. US, No. 2013-5093

Counsel for the Plaintiffs-Appellants certifies the following:

1.      The full name of every party represented by me is:

   Southwest Housing Compliance Corporation

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

   The real party in interest represented by me is Southwest Housing Compliance Corporation.

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:

   Southwest Housing Compliance Corporation is a wholly owned subsidiary and instrumentality of the Housing Authority of the City of Austin, Texas. No publicly-held corporation owns 10 percent or more of its stock.

4.      The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or agency or are expected to appear in this court are:

   Morrison & Foerster LLP
   Richard J. Vacura
   Tina D. Reynolds
   K. Alyse Latour

s/ Richard J. Vacura
Richard J. Vacura

Dated:  June 7, 2013

va-395783

## CERTIFICATE OF INTEREST
### CMS Contract Management Services, et al. v. U.S., No. 2013-5093

Counsel for Plaintiffs-Appellants certifies the following:

1.    The full name of every party represented by me is:

**National Housing Compliance**

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

**N/A**

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:

**None**

4.    The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or are expected to appear in this court are:

**Michael R. Golden, Michael A. Hordell, Samuel W. Jack**
**Pepper Hamilton LLP**

_____
Michael R. Golden

Dated:  June 7, 2013

1

## CERTIFICATE OF INTEREST

### CMS Contract Management Services, et al. v. U.S., No. 2013-5093

Counsel for Plaintiffs-Appellants certifies the following:

1.    The full name of every party represented by me is:

Assisted Housing Services Corporation

California Affordable housing Initiatives, Inc.

North Tampa Housing Development Corporation

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

N/A

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:

Assisted Housing Service Corporation is a wholly-own subsidiary of the Columbus (OH) Metropolitan Housing Authority

California Affordable Housing Initiatives, Inc. is a wholly-owned subsidiary of the Oakland (CA) Housing Authority

North Tampa Housing Development Corporation is a wholly-owned subsidiary of Tampa (FL) Housing Authority

4.     The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or are expected to appear in this court are:

Rogers Joseph O'Donnell, P.C.
Neil H. O'Donnell
Dennis J. Callahan
Jeffery M. Chiow


Neil H. O'Donnell

Dated: June 7, 2013

# **Table of Contents**

I. JURISDICTIONAL STATEMENT ........................................................ 1

II. STATEMENT OF THE ISSUES .......................................................... 1

III. STATEMENT OF THE CASE ............................................................ 2

IV. STATEMENT OF THE FACTS .......................................................... 6

    A. The Procurement History ............................................................ 6

        1. HUD's Section 8 Project-Based Program .......................... 6

        2. HUD Decides to Outsource Administration of the HAP
           Contracts Using PBACCs .................................................. 8

    B. HUD Issues An RFP For Contract Administration Services ....... 9

        1. The Government Procures Contract Administration
           Services through the PBACC and Pays the
           PBCA a Fee as Consideration ........................................... 11

           a. What the PBCAs do under the PBACCs ................. 11

           b. How the PBCAs get paid under the PBACCs ......... 14

        2. The HAP Contracts Remain Separate Instruments from
           the PBACCs and HUD Remains a Party to Them ............. 15

        3. HUD Makes Its First Attempt to Re-compete the
           PBACCs in 2011 ............................................................... 17

        4. HUD Rebrands the Solicitation as a "NOFA" and
           Seeks to Restrict Competition ........................................... 20

    C. GAO Sustains Appellants' Protests and Rules that the
        PBACCs Are Procurement Contracts ......................................... 22

    D. HUD Disregards the GAO Decision ........................................... 25

E.    The COFC Protests and Decisions ............................................... 26

V.    SUMMARY OF THE ARGUMENT ..................................................... 27

VI.   ARGUMENT ...................................................................................... 28

A.  Standard of Review .......................................................... 28

B.  Introduction ...................................................................... 30

C.  Because the PBACCs Are Procurement Contracts (And
    Not Cooperative Agreements) Under the FGCAA, The COFC's
    Judgment Must Be Reversed ............................................. 32

    1. The PBACCs are Procurement Contracts .................................... 33

        a.  The PBACCs' Terms and the Record Confirm That Its
            Principal Purpose Is for HUD to Acquire Services for
            HUD's Direct Benefit or Use ................................................. 35

        b.  GAO Applied the Proper Analysis and Correctly
            Found the PBACCs to be Procurement Contracts .................. 41

        c.  The COFC Failed to Perform a Proper Analysis of the
            PBACCs and Misapplied the FGCAA ................................... 45

            1.     The PBACCs Do Not Transfer "A Thing Of
                   Value" Within the Meaning of the FGCAA ...................... 46

            2.     The Services Provided by the PBACCs Are for
                   HUD's "Direct Benefit Or Use" ......................................... 47

            3.     The COFC Failed to Properly Consider GAO's
                   Decision and the Reasoning Supporting It ........................ 49

            4.     The COFC Improperly Relied on the Housing
                   Act's Hortatory Language to Trump the FGCAA ............. 50

            5.     The COFC Rejected HUD's Stated Basis for

Limited Award Of PBACCs To PHAs, but then Embraced It ........................................................................ 52

6.      The COFC Misapplied the FGCAA's "Substantial Involvement" Requirement ......................... 54

D.      Because the COFC Failed to Review the NOFA's Anticompetitive Restrictions Under the APA, the COFC's Judgment Must Be Reversed or Vacated ..................................... 55

VII.   CONCLUSION AND RELIEF REQUESTED ..................................... 62

## Table of Authorities

<u>**Cases**</u>

*360Training.com, Inc. v. United States*, 104 Fed. Cl. 575 (2012) .................... 59

*360Training.com, Inc. v. United States,* 106 Fed. Cl. 177(2012) ..................... 50, 56

*Ala. Aircraft Indus., Inc. v. United States,* 586 F.3d 1372 (Fed. Cir. 2009) ..... 56

*Allied Tech. Group, Inc. v. United States*, 649 F.3d 1320
(Fed. Cir. 2011) ................................................................................ 30, 44

*Allied Tech. Group, Inc. v. United States*, 39 Fed. Cl. 125 (1997) .................. 29

*Banknote Corp. of Am. v. United States*, 365 F.3d 1345 (Fed. Cir. 2004) ....... 29

*Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308 (Fed. Cir. 2007) ...... 28

*Centech Group v. United States*, 554 F.3d 1029 (Fed. Cir.2009) ................... 29, 30

*Cherokee Nation v. Leavitt*, 543 U.S. 631 (2005) ........................................... 45

*CMS Contract Mgmt. Servs. v. United States*, U.S. Claims LEXIS 307 .......... 4

*Core Concepts of Fla., Inc. v. United States,* 327 F.3d 1331, 1338
(Fed. Cir. 2003) ................................................................................ 45

*Council 81, AFSCME  v. Delaware,* 288 A.2d 453 (Del. Ch. 1972) ............... 58

*CRAssociates, Inc. v. United States,* 95 Fed. Cl. 357 (2010) ........................... 45, 56

*Gose v. USPS*, 451 F.3d 831 (Fed. Cir. 2006) ................................................ 48

*Grumman Data Sys. v. Dalton*, 88 F.3d 990 (Fed. Cir. 1996) ......................... 29

*Honeywell, Inc. v. United States*, 870 F.2d 644 (Fed. Cir. 1989) ................... 25, 30

*IDEA Int'l, Inc. v. United States,* 74 Fed. Cl. 129 (2006)................................ 44

*Impresa Construzioni Geom. Domenico Garufi v. United States,*
238 F.3d 1324 (Fed. Cir. 2001)......................................................... 55

*In re Mark Indus.,* 751 F.2d 1219 (Fed. Cir. 1984) ......................................... 62

*Laguna Hermosa Corp. v. United States,* 671 F.3d 1284 (Fed. Cir. 2012)...... 62

*Lincoln v. Vigil,* 508 U.S. 182 (1993)................................................................ 45

*Macke Co. v. United States,* 467 F.2d 1323 (Ct. Cl. 1972) .............................. 48

*Maintenance Engineers, Inc. v. United States,* 749 F.2d 724
(Fed. Cir. 1984)................................................................................. 29

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29, 43 (1983)................................................................ 56, 57

*Myers Investigative & Sec. Servs., Inc. v. United States,*
47 Fed. Cl. 605 (2000) ...................................................................... 29

*Ozdemir v. United States,* 89 Fed. Cl. 631(2009)............................................ 59

*Orion Tech., Inc. v. United States,* 704 F.3d 1344 (Fed. Cir. 2013)................. 29

*PAI Corp. v. United States,* 614 F.3d 1347 (Fed. Cir. 2010) ........................... 28

*Resource Conservation Group, LLC v. United States,* 597 F.3d 1238
(Fed. Cir. 2010) ................................................................................. 59

*Salazar v. Ramah Navajo Chapter,* 132 S. Ct. 2181 (2012)............................ 45

*Star-Glo Assocs., LP v. United States,* 414 F.3d 1349 (2005)......................... 45

*Thompson v. Cherokee Nation,* 334 F.3d 1075 (Fed. Cir. 2003)................. 30, 45

*Thompson/Center Arms Co. v. United States,* 924 F.2d 1041
(Fed. Cir. 1991) ................................................................................. 62

vi

*Turner Constr. Co. v. United States*, 645 F.3d 1377 (Fed. Cir. 2011) ............ 28, 30

*Univ. of Colo. Found. v. American Cyanamid Corp.,* 342 F.3d. 1298
(Fed Cir. 2003) ................................................................................... 57

## Administrative Decisions

*Assisted Housing Services Corp. et al.*, B-406738 et al., Aug. 15, 2012,
2012 CPD ¶236, 2012 U.S. Comp. Gen. LEXIS 205 ...................................... 1

*The Carrington Group, Inc. v. Dep't of Veterans Affairs*, CBCA No. 2091,
Apr. 2, 2012, 2012-1 BCA ¶ 34,993, 2012 CIVBCA LEXIS 87 .................... 29

*Council on Environmental Quality*, B-218816, June 12, 1986, 65 Comp.
Gen. 605, 1986 U.S. Comp. Gen. LEXIS 1039, *5 n.2 ................................... 34, 54

*Energy Conserv. Devices*, B-260514, June 16, 1995, 95-2 CPD ¶ 121 ........... 44

*Rocketplane Kistler,* B-310741, Jan. 28, 2008, 2008 CPD ¶ 22 ...................... 44

## Statutes

5 U.S.C. §706(2)(A) ........................................................................... 5, 29

28 U.S.C. §1295(a) ............................................................................. 1

28 U.S.C. §1491(b) ....................................................................*passim*

28 U.S.C. §2107 ................................................................................. 1

28 U.S.C. §2522 ................................................................................. 1

31 U.S.C. §3554 ................................................................................. 25

31 U.S.C. §6301 ................................................................................. 3

31 U.S.C. §6302 ................................................................................. 3

31 U.S.C. §6303 .......................................................................*passim*

31 U.S.C. §6304 .......................................................................*passim*

31 U.S.C. §6305 ..................................................................*passim*

31 U.S.C. §6306 ........................................................................ 3

31 U.S.C. §6307 ........................................................................ 3

31 U.S.C. §6308 ........................................................................ 3

41 U.S.C. § 3301 ...................................................................... 3

42 U.S.C. §1437(a) ...........................................................*passim*

42 U.S.C. § 1437f ............................................................*passim*

Pub. L. No. 75-412, 50 Stat. 888 (1937)............................. 50

Pub. L. No. 93-383, 88 Stat. 662 (1974)............................. 6, 7

Pub. L. No. 98-181, § 209(a)(1)-(2), 97 Stat. 1153 (1983) ............. 8

Pub. L. No. 105-276, §505, 112 Stat. 2461 (1998)................ 51

## **Regulations**

4 C.F. R *et seq.* ..................................................................... 19

24 C.F.R. §880.208(c)............................................................. 7

48 C.F.R. *et seq* .................................................................... 3

Fed. R. App. P. 4(a) ............................................................... 1

## **Other Authority**

United States Government Accountability Office, Principles of Federal Appropriation Law, vol. II (3rd ed. 2006) ..................................*passim*

S. Rep. No. 97-180, at 3 (1981) ....................................... 23

## Table of Acronyms

ACC-        Annual Contributions Contract

APA-        Administrative Procedure Act

CFDA-      Catalogue of Federal Domestic Assistance

CICA-       Competition in Contracting Act

COFC-      Court of Federal Claims

FAR-        Federal Acquisition Regulation

FGCAA-    Federal Grant and Cooperative Agreement Act

GAO-       Government Accountability Office

HAP-       Housing Assistance Payment

HFA-       Housing Finance Agency

HUD-       U.S. Department of Housing and Urban Development

NOFA-     Notice of Funding Availability

PBACC-    Performance-Based Annual Contributions Contract

PBCA-     Performance Based Contract Administrator

PBRA-     Project-Based Rental Assistance

PHA-      Public Housing Agency

RFP-       Request for Proposals

## **TABLE OF ADDENDUM**

**Description**                                                                  **Page**

Opinion and Order (April 19, 2013)…………………….......................... JA0001

Order (April 22, 2003)……………………………………………………..JA0038

Judgment (April 30, 2013)…………………………………..…………. JA0040

x

## <u>STATEMENT OF RELATED CASES</u>

No other appeal in or from the civil actions in the Court of Federal Claims has been before this or any other appellate court.  The case of *Summit Multi-Family Housing Corporation v. United States*, Fed. Cl. No. 13-80C, may be directly affected by this Court's decision in the pending appeal.

# I.    **JURISDICTIONAL STATEMENT**

The Court of Federal Claims ("COFC") had jurisdiction over the civil actions giving rise to this appeal pursuant to 28 U.S.C. §1491(b).  This Court has jurisdiction over this appeal pursuant to 28 U.S.C. §1295(a)(3).

The *Joint Notice of Appeal* from the April 30, 2013 Final Judgment, JA0040, was timely filed in accordance with 28 U.S.C. §§2107, 2522 and Fed. R. App. P. 4(a) on May 10, 2013.  JA6592.

# II.    **STATEMENT OF THE ISSUES**

1.  Whether the COFC erred in concluding that, under the Federal Grant and Cooperative Agreement Act, the Performance-Based annual contribution contracts ("PBACCs") are cooperative agreements and not procurement contracts.

2.  If the PBACCs are cooperative agreements, whether the COFC erred in failing to consider and rule that the Notice of Fund Availability ("NOFA") was arbitrary and capricious under the Administrative Procedure Act because its anticompetitive provisions improperly preclude Appellants from being considered for award of the PBACCs.

### III.    <u>STATEMENT OF THE CASE</u>

This appeal involves the U.S. Department of Housing and Urban Development's ("HUD") solicitation and award process for acquiring contract administration services in support of its Section 8 Project-Based rental assistance program.

Since 1999, HUD has acquired these services on a nationwide basis through 53 separate PBACCs, one for each state and certain territories.  The initial PBACCs were competitively awarded pursuant to an "RFP" expressly predicated on following principles of federal procurement law (although not formally following the Federal Acquisition Regulation).  Appellants were awarded and have been performing a number of these PBACCs around the country for many years.

In 2011, HUD sought to re-compete these contracts for the first time.  HUD's award decisions were met with **66 bid protests** filed at the Government Accountability Office ("GAO"), which has jurisdiction to hear bid protests regarding procurement contracts.  In response to these post-award GAO protests, for the first time in the history of the PBACCs, HUD stated that: the PBACCs are cooperative agreements, not procurement contracts, and therefore argued GAO lacked jurisdiction to hear the protests.  Before GAO could rule, HUD cancelled the challenged PBACC awards, which mooted the protests.  In March 2012, HUD re-issued its solicitation as a NOFA in which it re-branded the PBACCs as

2

"cooperative agreements" and limited competition to benefit a favored class of applicants (to the exclusion of Appellants), but left the terms and conditions of the PBACCs otherwise essentially unchanged.

In May 2012, Appellants filed pre-award GAO protests, alleging that the PBACCs were procurement contracts, that HUD's solicitation violated federal procurement laws, including through its anticompetitive restrictions, and that those restrictions were arbitrary and capricious. GAO sustained the protests, rejecting HUD's arguments that the PBACCs were cooperative agreements, while confirming their status as procurement contracts and that HUD had failed to comply with relevant procurement laws, including the Competition in Contracting Act ("CICA"), 41 U.S.C. §3301, and Federal Acquisition Regulation ("FAR"), 48 C.F.R. *et seq.*; JA300/AR2838-52 (*Assisted Housing Services Corp. et al.*, B-406738 *et al.*, Aug. 15, 2012, 2012 CPD ¶236, 2012 U.S. Comp. Gen. LEXIS 205).

Specifically, GAO examined the PBACCs in light of the Federal Grant and Cooperative Agreement Act ("FGCAA"), 31 U.S.C. §§6301-08, which requires an agency's choice of instrument to be dictated by its "principal purpose." Where the principal purpose of an agreement is to "acquire" supplies or services for the Government's "direct benefit or use," a procurement contract is required. 31 U.S.C. §6303. Where the principal purpose is not to acquire services or supplies for the Government's direct benefit or use, but rather to "transfer a thing of value"

3

to a recipient entitled to receive the federal assistance for a public purpose, then an assistance agreement (either a grant or cooperative agreement) is appropriate. 31 U.S.C. §§6304, 6305. GAO found that the services under the PBACCs were for HUD's direct benefit and use and that the PBACCs therefore were procurement contracts. A300/AR2850-51.

HUD's reaction to GAO was highly unusual. It announced that it simply planned to ignore GAO's decision and award new PBACCs under the flawed solicitation. GAO's records show that of the 5,703 protest decisions (1099 sustained), from 1997-2012, an agency has only ignored GAO ten times. HUD's action forced Appellants to file protests at the COFC.

The COFC focused largely on a threshold question to the FGCAA analysis: whether HUD has the statutory authority to use a cooperative agreement, a necessary prerequisite to awarding a cooperative agreement. The COFC found that such authority existed, but then provided only a cursory evaluation of the FGCAA requirements (i.e., the principal purpose test). Based largely on broad statutory language in the Housing Act, and without any meaningful examination of the PBACC terms, the agency record or GAO's analysis, on April 19, 2013, the COFC concluded that the PBACCs were cooperative agreements. JA0001-0037 (*CMS Contract Mgmt. Servs. v. U.S.*, 2013 U.S. Claims LEXIS 307). Appellants appeal this aspect of the COFC decision.

4

The COFC erred in another respect. The COFC's bid protest jurisdiction is broader than GAO's, and under the Tucker Act, 28 U.S.C. §1491(b)(1), the COFC has jurisdiction over proposed contracts, procurement actions or actions in connection with a procurement, including certain cooperative agreements, involving the acquisition of property or services. The Tucker Act, 28 U.S.C. §1491(b)(4), directs the COFC to review an agency's procurement decisions pursuant to the Administrative Procedure Act ("APA"), *i.e.*, 5 U.S.C. §706(2)(A). Despite explicitly finding that it had jurisdiction over the PBACCs under the Tucker Act, the COFC failed to review HUD's PBACC solicitation process under the APA standard of review, as it was required to do. Appellants also appeal this aspect of the COFC decision.

On April 22, the COFC summarily and without any meaningful analysis denied a motion to stay its decision pending appeal to this Court. JA0038-39 (unpublished Order). On April 30, the COFC entered Judgment in favor of the Government. JA0040. On May 10, Appellants filed a Joint Notice of Appeal to this Court, JA6592, and, on May 20, filed a Motion for Temporary Stay and for Stay Pending Appeal with this Court, which as of the filing of this Brief remains pending.

## IV.    STATEMENT OF THE FACTS

### A.    The Procurement History

#### 1.    HUD's Section 8 Project-Based Program

Under Section 8 of the Housing Act of 1937 ("Housing Act"), 42 U.S.C.

§1437f *et seq.,* HUD provides rental assistance to benefit low-income families and

individuals through various types of subsidies.  JA0003.  In the Section 8 Project-

Based housing assistance program at issue here, HUD provides rental subsidy

payments via Housing Assistance Payment ("HAP") contracts to the owners of

multi-family housing to subsidize the rent of low-income tenants.  These "Project-

Based" payments are attached to specific units or buildings. JA300/AR2839.

The Housing Act was amended in 1974 to provide for three different

categories of housing in the Project-Based program: (i) existing housing, (ii) newly

constructed housing, and (iii) substantially rehabilitated housing.  Pub.L.No. 93-

383, §201(a), 88 Stat. 662-63, codified at 42 U.S.C. §1437(a)(1) *et seq.* ("1974

Amendments").  This case primarily involves the second and third categories: new

construction and substantial rehabilitation projects, the authority for which was

provided in Subsection (b)(2)[1] of the 1974 Amendments.[2]  To promote the 1974

---

[1] As discussed, *infra* 6, Subsection (b)(2) was repealed in 1983, but remained in effect with respect to previously selected projects.

[2] For existing housing, HUD was authorized to enter into annual contributions contracts ("ACCs") with Public Housing Agencies pursuant to which they would

Amendments' goal to increase the nation's low-income housing stock, for those categories, HUD was "authorized to make assistance payments pursuant to contracts with owners or prospective owners who agree to construct or substantially rehabilitate housing." 88 Stat. 662-63.  HUD's promised HAP payments served as collateral enabling the owners to obtain HUD or HUD--insured loans to build the projects, and the HAP payments (over the 20-40 year duration of the HAP contract) helped service the owner's mortgage debt.  *See* 24 C.F.R. §880.228(c); JA300/AR230.  Thus, HUD has a very real stake in the projects in the Project-Based program.

Under the authority of the 1974 Amendments, HUD entered into some 21,000 HAP contracts directly with project owners, which represented the vast majority of the cases under the Project-Based program.[3] JA300/AR2840.  For a variety of reasons, including the need to amortize the costs associated with new construction and substantial rehabilitation, the terms of the HAP contracts HUD

---

then enter into contracts to make housing assistance payments to owners of existing projects.  42 U.S.C. §1437f(b)(1).  At its inception, Subsection (b)(1) was primarily designed to support tenant-based programs, which are not at issue here, but it has also supported certain specific Project-Based programs.  JA0006.  As the COFC ruled, Subsection (b)(1) arrangements are not at issue here.  JA0021-22, 26-27.

[3] The 1974 Amendments presented HUD with a second option: to enter into ACCs with PHAs which, in turn, would enter into HAP contracts with the project owners to provide assistance payments.  88 Stat. 662-63   In approximately 4,200 cases, HUD followed this approach.  A300/AR428.

entered with project owners were lengthy, ranging from 20 to 40 years.

JA300/AR231.

In 1983, Congress repealed Subsection (b)(2),the net effect of which was

that HUD could not establish new substantial rehabilitation or new construction

projects. Pub. L. No. 98-181, §209(a)(1)-(2), 97 Stat. 1153, 1183 (1983); JA0007.

However, HUD continued to make assistance payments to Section 8 owners under

its existing HAP contracts and, for the next 16 years, HUD funded and directly

administered approximately 21,000 of these HAP contracts. *Id.* HUD also

renewed many of these HAP contracts as their original terms expired. *Id.*

### 2.    HUD Decides to Outsource Administration of the HAP Contracts Using PBACCs

By 1999, the annual value of these HAP contracts was about $7.5 billion.

JA300/AR1833.  HUD, with its own staff, was still administering about 21,000

HAP contracts.  JA300/AR258-59.  However, agency staffing constraints, internal

reform plans and HUD Inspector General assertions of mismanagement caused

HUD to decide to outsource certain contract administration services related to the

HAP contracts.  JA300/AR233.

In its FY 2000 budget request, HUD sought an additional $209 million to

pay for this outsourcing program.  JA300/AR253.  HUD noted that the contract

administrators will "improve the oversight of HUD's project-based program," *id.*,

and that it "plans to **procure** the services of contract administrators to assume

8

many of these specific duties, in order to release HUD staff for those duties that only government can perform and to increase accountability for subsidy payments." JA300/AR259 (emphasis added).

### B.    HUD Issues an RFP for Contract Administration Services

On May 3, 1999, HUD issued an RFP seeking offerors to provide contract administration services related to the Project-Based HAP contracts. JA300/AR428. The RFP advised that "offerors will competitively bid to perform contract administration services for properties with project-based Section 8 HAP Contracts." JA300/AR429.

Consistent with its representation to Congress that it planned to "procure" administrative services, HUD's first nationwide "Performance Based Contract Administrator" ("PBCA") competition took the form and substance of a procurement. The RFP stated that HUD would only enter a PBACC with a "'public housing agency' (PHA) as defined in the U.S. Housing Act of 1937" or a joint venture or partnership between a PHA and another party. JA300/AR429. While the 1999 RFP did not include Federal Acquisition Regulation ("FAR") clauses, the Federal Register notice publishing it stated that it would follow many FAR principles. JA300/AR428 ("This solicitation is not a formal procurement within the meaning of the [FAR] but will follow many of those principles."). In the RFP, HUD established a competitive process and included various procurement

9

concepts including: (i) "Section 3. Statement of Work" (JA300/AR430-35), (ii)

instructions as to proposal organization (JA300/AR440), and (iii) evaluation

factors and "Factors for Award" (JA300/AR441). The RFP had a two-year base

"Contract Term," with three one-year options. JA300/AR440.

The RFP noted that HUD would pay the PBCA an "Administrative Fee" that

consisted of a basic fee and an "incentive" fee. JA300/AR435. HUD agreed to: (i)

"pay the basic fee for performance of tasks described in the Statement of Work"

pursuant to monthly invoices submitted by the contractor, *id*. (RFP §4.1), (ii) pay

an "incentive fee" where the contractor exceeded the quality level in its

performance of Statement of Work tasks. *Id.*

RFP §5 advised that offerors "must bid to provide contract administration

services for areas no smaller than a single state," JA300/AR440, and that the

failure to follow the RFP's instructions "will disqualify an Offeror's proposal from

consideration." *Id.* Finally, the RFP stated that HUD would evaluate proposals "to

determine which offerors represent the best overall value, including administrative

efficiency, to the Department." JA300/AR442 (emphasis added).

The RFP also included a copy of the proposed PBACC which states "[t]his

ACC is a contract between the PHA and HUD." JA300/AR449. The terms of the

PBACC included the basic services that HUD told Congress it intended to procure.

10

These services were delineated in the RFP, which was incorporated into the

contract, and called for the PHA to perform 11 "Core Tasks."  JA300/AR430.

HUD awarded 37 PBACCs pursuant to the 1999 RFP.  Due to a lack of

qualified applicants it was not able to make an award in 16 of the 53 jurisdictions.

JA0013; JA300/AR463 ("*HUD's Performance Based Contract Assistance*

*Program Was Not Cost Effective*," OIG Rept. No. 2010-LA-0001, Nov. 12, 2009).

From 2001 to 2005, HUD awarded an additional 16 PBACCs through competitive

procurements.  *Id*.  To date, this effort represents HUD's first and only successful

effort to compete the PBACCs on a nationwide basis.

1.     **The Government Procures Contract Administration
Services through the PBACC and Pays the PBCA A Fee As
Consideration**

a.     **What PBCAs do under the PBACCs**

The tasks required by the PBACCs have not changed significantly between

HUD's first nationwide competition (the 1999 RFP) and HUD's attempts at a

second nationwide competition (in 2011 and 2012).  JA300/AR427-458 (1999

RFP); JA6161-6219 (2011 Invitation ACC); JA300/AR1357-1417.  The 2012

PBACC includes eight "Performance Based Tasks"; Tasks 6-8 are explicitly

administrative in nature and specify monthly, quarterly and annual reports that the

PBCA must file.  JA300/AR1391-1400.  Tasks 1-5 follow a pattern of requiring

the PBCA to "monitor," "verify" and report to HUD on various aspects of owner

11

compliance, but provide little to no discretion or enforcement authority to the

PBCA. JA300/AR1374-1400. Instead, HUD retains those functions as discussed

below.

For example, Task1,[4] Management and Occupancy Reviews, requires the

PBCA to review projects in light of highly detailed forms and checklists developed

by HUD and incorporated into the PBACC. JA300/AR1376-78. However, when

compliance issues arise, the PBCA is generally limited to reporting those to HUD.

JA300/AR1377 (directing the PBCA to "[p]rovide the jurisdictional HUD office

with reports rated below average or unsatisfactory"). Only HUD, through its

Departmental Enforcement Center ("DEC"), has the ability to take action against

the project owner. JA300/AR1869-78. In addition, HUD retains responsibility for

addressing issues with property owners when a Physical Inspection Report Score

of between 31 and 59 is received. JA300/AR1879-83. The HUD "Hub" or

Program Center, not the PBCA, is responsible for addressing the deficiencies with

the project owner, re-inspecting the property, and placing "flags" in the Active

Partners Performance System ("APPS"). *Id.* Similarly, a January 16, 2003, HUD

memo makes clear it is HUD's responsibility "to ensure the properties are 'decent,

safe, sanitary and in good repair'" and that "HUD will pursue actions" if owners

cannot or will not improve inadequate conditions. JA300/AR1884-85. HUD also

---

[4] The 2012 PBACC revised "Task #1–"Management and Occupancy Reviews," to limit them only to high risk properties and not all properties. JA300/AR1915.

retains responsibility for follow-up and enforcement actions for violations of lead-based paint requirements.  JA300/AR1890, 1898.

All of this is consistent with HUD's "Occupancy Handbook" which states that HUD has "primary responsibility" for contract administration, and has assigned only "a portion" of these duties.  JA300/AR1929.

Under Task 3, Review and Pay Monthly Vouchers, the PBCA's role is to verify the owner vouchers submitted to HUD and to disburse HAP payments when provided by HUD.  JA300/1385-86.  To obtain HAP payments, owners must submit vouchers into HUD's "Tenant Rental Assistance Certification System" (TRACS) system.  JA300/AR1383.  HUD provides the PBCA with access to TRACS and the PBCA reviews the vouchers in HUD's TRACS system, to "verify" and "certify" their accuracy.  JA300/AR1385-86.

Even where HUD is using  a PBCA's services, HUD remains obligated to make the HAP payment to the project owner pursuant to the HAP contract.  *Infra* 23-24.  After the PBCA verifies the accuracy of the owner's voucher in HUD's system, HUD flows the HAP payment to the project owner through a designated account provided under the PBACC and governed by a "Depository Agreement." JA300/AR1363-64 ("the PHA shall enter into a Depository Agreement in the form prescribed by HUD" and "[t]he PHA may only withdraw deposited Program Receipts for use in connection with the program in accordance with HUD

requirements, including payment of housing assistance payments to owners." )
The PBCA <u>must</u> make payments to owners by <u>the first business day</u> after
receiving HAP funds from HUD.  JA300/AR1383.

The PBACC states that the PBCA shall use HAP funds only to pay housing
assistance to owners for Covered Units.  *Id.*  Any interest that accrues on the funds
while in the depository account belongs to HUD, or must be invested per HUD
requirements.  JA300/AR1363.  The HAP funds do not become the funds of the
PHA.  *Id.*  In addition, only HUD can direct that HAP payments to owners be
stopped.  JA300/AR1377-78.  Consistent with these points, HUD has always
considered PBCAs to be acting as mere "conduits" for the HAP payments,
JA300/AR1418, and GAO so found.  JA300/AR2849.

### b.      How the PBCAs get paid under the PBACCs

Since the PBACCs' inception, they have plainly called for the PBCA to
provide HUD basic contract administration services in exchange for an
administrative fee for successful performance.  JA300/AR435-39 (1999 RFP);
JA300/AR808-11 (2012 ACC).  The PBCA "earns" this administrative fee by
successfully performing the Tasks called for by the PBACC.  *Id.*  The PBACC
does not provide the federal assistance to owners or tenants.  As discussed below,
that assistance is obligated separately through the HAP contracts.

The PBACC proposed in HUD's 2011-12 attempts at a second nationwide "competition" retains the administrative fee approach, and includes a basic fee and an incentive fee, both of which are tied to performance.  JA300/AR809.  It also includes a third performance driven component, a "Disincentive Deduction" through which HUD can reduce the basic administrative fee "[i]f HUD determines that the PHA has performed below the AQL [Acceptable Quality Level] in any month."  *Id*.

## 2.     The HAP Contracts Remain Separate Instruments and HUD Remains a Party to Them

The HAP contract and the payment it provides are separate from and not dependent on the existence of the PBACCs.  The terms (including performance period) of the two contracts are different and are not congruent.  The HAP contracts are on renewals, as determined by HUD, ranging from one to 20 years.  JA300/AR1825.  The PBACCs contemplated by the NOFA have a two-year term with the potential for additional one-year options.  JA300/AR1360.  Under the PBACCs' terms, HUD has the authority to "unilaterally amend … [the PBACC] from time to time to add and/or withdraw HAP contracts by giving the PHA written notice."  *Id*.   In other words, HUD, not the PBCA, determines which projects receive assistance.

After HUD elected to procure the services of PBCAs, HUD did not cease to be a party to the HAP contracts.  In fact, HUD remains a party to the HAP

contracts and renewals and has the primary obligations under it – including the obligation to provide the assistance payments to the property owner, which is the essence of the HAP contract. JA300/AR2264-82, 2270. HUD's official "Section 8 Renewal Guide," acknowledges that HUD remains "contractually bound" by the HAP contract renewal. JA300/AR2021. The "HUD Occupancy Handbook" states that HUD has "primary responsibility" for contract administration, and has assigned only "portions" of these duties to PBCAs. JA300/AR1929.

The PBACCs and the HAP contracts are separate agreements. In addition, HUD has consistently distinguished between the PBCA function and HAP rental assistance. For example, in its FY 2013 budget request, HUD "request[s] a total of $8.7 billion to meet Project-Based Rental Assistance (PBRA) program needs." JA300/AR1959. HUD then separately requested funding for the PBCAs: "The fiscal year 2013 request also includes $260 million for Project-Based Contract Administrators (PBCA)." *Id.* (Prior years' budget requests draw this important distinction. *E.g.*, JA300/AR1974, 1985.) Consistent with HUD's budget request, Congress appropriated funds to the PBRA assistance program and specifically identified the funds for the PBCA contracting program. JA300/AR2007.

HUD continues to characterize the PBACCs as contracts to obtain services to relieve a burden on HUD's staff and to improve HUD's program oversight. HUD's FY 2011, 2012, and 2013 budget documents clearly acknowledge HUD is

entering into a contract with the PBCA: "Through this set-aside, the Department funds <u>contracts</u> with performance-based contract administrators."  JA300/AR1960 (emphasis added); *see generally* JA300/AR1959-98.  HUD then describes the PBCA's functions and relationship to HUD:

> These administrators … are responsible for conducting on-site management reviews of assisted properties; administering contract rents; reviewing, processing of, and paying monthly vouchers submitted by owners.  PBCAs are integral to the <u>Department's efforts</u> to be more <u>effective and efficient in the oversight and monitoring</u> of this program.

*Id.* (emphasis added).

HUD states "[t]he program set-aside of $260 million for PBCAs is an important tool to administer the program in a cost effective manner….  PBCAs <u>have helped make HUD a leader</u> among Federal agencies in reducing improper payments."  JA300/AR1963 (emphasis added).  HUD's budget requests also make clear that the role of the PBCAs is to "support" HUD's Field Staff.  JA300/AR1964 ("Field Staff perform the following functions, with support from PBCAs, to administer the PBRA program").

### 3.    HUD Makes Its First Attempt to Re-compete the PBACCs in 2011

In 2011, HUD initiated its first attempt to re-compete the PBACCs nationwide through an "Invitation for Submission of Applications: Contract

17

Administrators for Project-Based Section 8 [HAP] Contracts" ("2011 Invitation").
JA300/AR2842.

HUD was under significant pressure to re-compete the PBACCs, including
from its Inspector General, which in 2009 found significant waste in the PBCA
initiative. JA300/AR468. In response, HUD pledged to re-compete the PBCA
contracts through a process that (1) was competitive and market driven; (2) would
increase the potential number of applicants; and (3) would encourage PBCAs to
operate in various geographical areas to provide efficiencies and economies of
scale. JA300/AR490.

The majority (currently 37) of PBCAs are in-state Housing Finance
Agencies ("HFAs"). JA300/AR2000. The HFAs were adamantly opposed to re-
competition and four days after the IG report, their trade association, the National
Council of State Housing Agencies ("NCSHA"), wrote to HUD asking it to re-
consider its plan or at least afford incumbents a competitive preference.
JA300/AR676. HUD responded that "sound business and auditing practices
would look to periodically re-compete contracts to ensure that the Government is
getting the best value" and rejected the preference request: "[i]n order to provide
the Department with the full benefit of a competitive action there will be no
priority or preference status." *Id.* HUD reiterated that "[t]he major reason for the
establishment of the Performance-Based Contract Administration program was to

18

increase the effectiveness and efficiency of HUD's oversight of its Section 8
[PBRA] program." *Id.*

The 2011 Invitation's terms largely tracked those of the 1999 RFP.  JA0013-
14; JA300/AR2843.  Consistent with HUD's commitment to its IG, and as with the
previous PBACC procurements, offerors were eligible to bid in multiple states
without geographic restriction.  In July 2011, HUD announced awards for all 53
jurisdictions, and stated that through its competitive, best-value procedures it
would save $100 million per year.  JA6222.  Appellants were awarded multiple
contracts in multiple states.  For example, Navigate was awarded contracts in six
states. JA300/AR317-18; JA300/AR1424, 1428. The HFAs were not as fortunate,
losing in all but 10 of the 42 jurisdictions where they faced competition.
JA300/AR317-18; JA300/AR412.

For all 42 jurisdictions where HUD received more than one bid, HUD's
contract awards were protested to GAO, JA0014, which received a total of 66 post-
award protests.  JA300/AR2843.  Among other things, protesters asserted that the
PBACCs were procurement contracts – as they had to be to establish GAO
jurisdiction, 4 C.F. R. § 21.0 *et seq.* -- and that HUD had violated procurement
laws in its award decisions.  JA0014-18; *see* JA300/AR1424, 1428.  In August
2011, HUD declined to respond to the substance of the protests and notified GAO
that it would terminate the awards for all 42 protested contracts and "evaluate and

19

revise its competitive award process." JA300/AR2843. Accordingly, GAO

dismissed the protests as academic. *Id.* HUD allowed the remaining 11 PBACCs

to be performed. *Id.*

### 4. HUD Rebrands the Solicitation as a "NOFA" and Seeks to Restrict Competition

On March 9, 2012, HUD re-issued its PBACC solicitation, including the

proposed PBACC. The underlying PBACC terms were largely unchanged.

However, HUD's solicitation for the first time characterized the PBACCs as

"cooperative agreements." JA300/AR85. HUD also re-branded the solicitation as

a "NOFA," a term HUD typically uses when awarding grants and cooperative

agreements. JA300/AR0079-117. HUD stated that it would no longer allow

applicants (including Appellants) to compete for PBACCs outside their home

states. Specifically, the NOFA stated:

> **HUD will consider applications from out-of State applicants *only* for States for which HUD does not receive an application from a legally qualified in-State applicant. Receipt by HUD of an application from a legally qualified in-State applicant will result in the rejection of any applications that HUD receives from an out-of-State applicant for that State**. [Bold emphasis added.]

JA0015; JA300/AR82. In the NOFA, HUD acknowledged that, under the 2011

Invitation, it received an offer from the in-State HFAs in all but a handful of states

and that it expected to receive such in-State offers in response to the NOFA, *see*

20

JA300/AR82, demonstrating that HUD knew that the NOFA would exclude out-of-state applicants in virtually all cases. *Id*.

HUD's NOFA did not offer any rationale for excluding from consideration many of the very applicants, including Appellants, with which it currently contracts and which in 2011 it determined presented the best value to HUD in many states. JA300/AR317-18. It did acknowledge that "nothing in the 1937 [Housing] Act prohibits an instrumentality PHA[5] . . . from acting as a PHA in a foreign state." JA300/AR82. HUD also did not identify any change in law or in program requirements that necessitated or warranted such a change in practice.

Without explanation, HUD posted to its NOFA website six letters that certain HFAs had solicited from their respective state attorneys general ("AG letters") that allegedly support this restriction on competition. *See* A0014 n.7. When asked, during the NOFA process, to explain the basis for the new restriction on PHAs crossing state lines, the only reason HUD provided was that the AG

---

[5] The Housing Act defines a "Public Housing Agency" or "PHA" as "any State, county, municipality, or other governmental entity or public body (or agency or instrumentality thereof) which is authorized to engage in or assist in the development of operation of public housing." 42 U.S.C. §1437a(b)(6)(A). It is undisputed that each Appellant qualifies as a PHA. JA0016. Under this Housing Act provision, a qualified state Housing Finance Agency or "HFA" is but one type of entity which would qualify as a "PHA." The statutory definition of PHA makes no distinction between qualified HFAs and other types of PHAs (such as Appellants). Thus, the Housing Act does not elevate qualified HFAs over other qualified PHAs, including Appellants.

letters were "a factor," which created risk of "program disruption." JA300/AR181-82 (Questions 96, 99, 100). HUD refused to: (i) answer other questions regarding the AG letters, and (ii) respond to Appellants' inquiries which raised substantial questions about the validity, effect and accuracy of the AG letters, both prior to and during the protests. *E.g.,* JA6291-6311. For example, Appellants demonstrated that the AGs are not disinterested – in nearly all cases they treat the HFA as their "client;" the HFAs solicited the AG letters and supplied the AG with undisclosed facts and arguments; and to the extent they addressed out-of-state PHAs (and several did not), the letters conflated state definitions of "public housing authorities" with the federal definition of "Public Housing Agency." JA6301-02. Appellants also raised these and other substantial issues before the COFC, but the COFC decision did not address them.

### C.    GAO Sustains Appellants' Protests And Rules That The PBACCs Are Procurement Contracts

In May 2012, all but one of Appellants filed pre-award protests at GAO, challenging the NOFA's improper restrictions. A0015; JA300/AR2838. Protesters demonstrated that the PBACCs' principal purpose was for HUD to acquire services for its own direct benefit and use, thus making them procurement contracts (as opposed to cooperative agreements) under the FGCAA. JA300/AR2845. Protesters also showed that the NOFA's terms violated procurement laws,

including CICA and the FAR, and that the NOFA's terms were arbitrary and capricious.  JA300/AR2852.

GAO carefully considered the PBACC instrument, the various solicitations HUD has utilized (including the NOFA), and the contemporaneous record.  GAO explicitly reviewed the Housing Act, including its broad policy language set forth at 42 U.S.C. §1437(a).  JA300/AR2848.  GAO examined the PBACCs' principal purpose and found the relationship between HUD and the PBCAs created an "intermediary" situation: the assistance (the HAP payment) is authorized to specified recipients (the property owners) but the Federal grantor (HUD) delivers the assistance to the authorized recipients by utilizing another party (the PBCA) as a mere "conduit."  JA300/AR2849.  GAO found that HUD was acquiring the PBCAs' services as an intermediary to perform HAP contract administration services for HUD's benefit.  JA300/AR2850-51.  GAO stated that "the asserted 'public purpose' provided by the PHAs under the NOFA – the administration of HAP contracts – is essentially the same purpose HUD is required to accomplish under the terms of its HAP contracts, wherein HUD is ultimately obligated to the property owners."  JA300/AR2851.  GAO noted that in such a situation "the choice of instrument for an intermediary relationship depends solely on the principal federal purpose in the relationship with the intermediary."  JA300/AR2847 (quoting S. Rep. No. 97-180, at 3 (1981)).  GAO stated that HUD "is legally

obligated to pay the property owners under the terms of the HAP contracts" and noted "HUD's recognition that it has primary responsibility for contract administration but has assigned portions of these responsibilities to PHAs." JA300/AR2850. Based on these findings, GAO ruled that the PBACCs' principal purpose was for HUD "to acquire the PHAs' services as contract administrators." JA300/AR2851.

GAO rejected HUD's arguments that the HAP payments to property owners were a transfer of a "thing of value" to the PBCAs, which would have permitted the use of a cooperative agreement under the FGCAA. JA300/AR2849. GAO also disagreed with HUD's assertion that the principal purpose of the PBCA's administrative fee is to "assist" the PBCAs in the performance of their mission, stating: "the administrative fees are paid to the [PBCAs] as compensation for their provision of service - i.e. administering the HAP contracts. This arrangement, that is, the payment of fees by HUD for the [PBCAs'] services as contract administrators, is provided for by the NOFA and [PB]ACCs to be awarded." JA300/AR2849-50.

GAO received considerable briefing on Section 8 and the relevant legislative history of the Housing Act, and went so far as to request that HUD provide a supplemental agency report on precisely these issues. JA300/AR2593-96. GAO gave explicit consideration to HUD's arguments regarding the Housing Act, and

discussed the Housing Act in its decision.  JA300/AR2848.  GAO however, did not

need to reach the issue of whether the Housing Act conferred authority for an

assistance agreement, given its finding that the PBACCs were procurement

contracts.  JA300/2851 n.20.  GAO recommended that HUD "cancel the NOFA,

and solicit the contract administration services for the Project-Based Section 8

rental assistance program through a procurement instrument that will result in the

award of contracts."  JA300/AR2852.

### D.    HUD Disregards The GAO Decision

On October 19, 2012, HUD advised that it had not implemented GAO's

recommendations because HUD was still "continu[ing] to assess the legal and

operational issues raised by the Recommendations.  HUD is committed to

continuing its careful consideration of the statutory, regulatory, economic, policy

and administrative implications prior to determining how to proceed regarding the

Recommendations."  JA300/AR8.  On December 3, HUD announced on its

website that "[t]he Department has decided to move forward with the 2012 PBCA

NOFA and plans to announce awards on December 14, 2012."  JA300/AR9.

HUD's decision to disregard the GAO's decision was exceptionally rare.[6]

---

[6] "Congress contemplated and intended that procurement agencies normally would follow the Comptroller General's recommendation."  *Honeywell, Inc. v. U.S.*, 870 F.2d 644, 648 (Fed. Cir. 1989).  That Congress intended GAO's decisions to be followed is further evidenced by the statutory requirement that an agency's decision to disregard the decision be formally reported to Congress.  31 U.S.C.

### E.   The COFC Protests and Decisions

In response to this HUD announcement, beginning on December 10, 2012, Appellants filed separate pre-award protests at the COFC to enjoin HUD from proceeding with the NOFA.  Protesters asserted that the contracts contemplated under the NOFA were procurement contracts, as GAO had determined them to be. Protesters also asserted that, even if the PBACCs were cooperative agreements, under its Tucker Act jurisdiction the COFC should find the NOFA's anticompetitive provisions to be arbitrary and capricious under the APA.

The administrative record before the COFC was essentially identical to the GAO record.  On April 19, 2013, the COFC issued an "Opinion and Order" denying the protests.  JA0001-37.  Preliminarily, the COFC found that it had jurisdiction under the Tucker Act, 28 U.S.C. § 1491(b)(1), over the NOFA and the PBACCs, and denied HUD's motion to dismiss for lack of subject matter jurisdiction.  JA0018.  The COFC then proceeded with a lengthy analysis of the complex statutory history related to Section 8 and what the COFC described as a "morass of arcane housing assistance statutes and regulations."  JA0003.  The COFC ruled that HUD had the authority to enter into cooperative agreements.

---

§3554(e)(2).  From 1997-2012, GAO issued 5,703 merit decisions and sustained 1099 protests.  During that period, an agency has disregarded GAO recommendations only 10 times.  *See* http://www.gao.gov/legal/bids/bidproan.htm (last visited on June 6, 2013).

26

JA0027.  However, this issue of statutory authority is but a threshold question to the FGCAA-required analysis of the instrument's principal purpose.

With respect to the FGCAA's "principal purpose" test, the COFC provided minimal analysis and virtually no reference to the administrative record, but nevertheless reached a different result from GAO by finding that the PBACCs were cooperative agreements.  JA0035-36.  The COFC also failed to address Appellants' assertions that the NOFA, including its anti-competitive provisions, was arbitrary and capricious, in violation of the APA, even if the PBACCs were cooperative agreements.

The COFC entered final judgment on April 30. JA0040.  This Appeal followed.

## V.    <u>SUMMARY OF THE ARGUMENT</u>

Appellants challenge the COFC's decision on two separate grounds.  First, Appellants demonstrate that the COFC erred in concluding that, under the FGCAA, the PBACCs are cooperative agreements (and not procurement contracts).  Appellants show that the COFC failed to give proper consideration to the FGCAA's requirements including the "principal purpose" of the PBACC.  The contract's terms and the record discussing it make clear that the PBACC's purpose is for HUD to acquire the PBCA's services for its direct benefit and use.  The COFC also erred by ignoring the GAO's decision and supporting rationale, in

27

particular GAO's finding that the PBACCs represent an "intermediary" situation indicative of a procurement. Finally, what little analysis the COFC did apply under the FGCAA was fundamentally flawed. If Appellants are correct on the first question, HUD has admitted that the NOFA violates various procurement laws and regulations and cannot stand.

Second, even if the COFC correctly decided the PBACCs are cooperative agreements, the COFC erred in failing to consider or assess whether, under the APA, the NOFA was arbitrary and capricious because of its improperly anticompetitive provisions.

## VI.  ARGUMENT

### A.  Standard of Review

This Court reviews "rulings on motions for judgment on the administrative record *de novo* ... [and] factual findings based on the administrative record for clear error." *PAI Corp. v. U.S.,* 614 F.3d 1347, 1351 (Fed. Cir. 2010) (citations omitted); *Turner Constr. Co. v. U.S.*, 645 F.3d 1377, 1383 (Fed. Cir. 2011); *see Blue & Gold Fleet, L.P. v. U.S.*, 492 F.3d 1308, 1312 (Fed. Cir. 2007).

As the COFC observed, "the relevant issue here is not whether the PBACCs are 'contracts,' but rather what type of contractual relationship they represent with the Government." JA0021 n.10. Whether the instruments at issue, the PBACCs, are procurement contracts or cooperative agreements -- i.e., the determination of

28

what type of contract is present here -- is a question of law which this Court

reviews *de novo*. *See Maintenance Engineers, Inc. v. U.S.*, 749 F.2d 724, 726 n.3

(Fed. Cir. 1984); *Myers Investigative & Sec. Servs., Inc. v. U.S.*, 47 Fed. Cl. 605,

617 (2000); *The Carrington Group, Inc. v. Dep't of Veterans Affairs*, CBCA No.

2091, Apr. 2, 2012, 2012-1 BCA ¶ 34,993, 2012 CIVBCA LEXIS 87, at *17;[7] *see*

*Banknote Corp. of Am. v. U.S.*, 365 F.3d 1345, 1353 (Fed. Cir. 2004)

("Interpretation of the solicitation is a question of law over which we exercise

independent review.").

The second issue on appeal – *i.e.*, assuming the PBACCs are cooperative

agreements, whether the COFC erred in failing to consider and rule that the NOFA

included anticompetitive provisions that improperly preclude Appellants from

being considered for award of the PBACCs – should have been reviewed by the

COFC under the arbitrary and capricious standard of the APA, *i.e.*, 5 U.S.C. §

706(2)(A). *Orion Tech., Inc. v. U.S.*, 704 F.3d 1344, 1347 (Fed. Cir. 2013);

*Centech Group v. U.S.*, 554 F.3d 1029, 1037 (Fed. Cir.2009). On appeal, this

Court reapplies the APA standard and must determine whether "(1) the

procurement official's decision lacked a rational basis; or (2) the procurement

---

[7] "The principles governing interpretation of Government contracts apply with equal force to the interpretation of solicitations issued by the Government for such contracts." *Banknote Corp. of Am. v. U.S.*, 365 F.3d 1345, 1353 n.4 (Fed. Cir. 2004) (citing *Grumman Data Sys. v. Dalton*, 88 F.3d 990, 997-98 (Fed. Cir. 1996)); *see Allied Tech. Group, Inc. v. U.S.*, 39 Fed. Cl. 125, 138 (1997).

procedure involved a violation of regulation or procedure." *Centech Group*, 554 F.3d at 1037 (citation omitted).

In addition, "Congress contemplated and intended that procurement agencies normally would follow the Comptroller General's recommendation." *Honeywell, Inc. v. U.S.*, 870 F.2d 644, 648 (Fed. Cir. 1989); *see id.* at 647, 649 (Claims Court "failed to give appropriate deference to the GAO's conclusion" in a bid protest); *Turner Constr.*, 645 F.3d at 1384 (COFC correctly "[r]ecogniz[ed] that its review [of a GAO bid protest decision] was a deferential one"). Furthermore, this Court has "relied … on the opinions of the Comptroller General, … [which] while not binding, are expert opinions, which we should prudently consider." *Thompson v. Cherokee Nation*, 334 F.3d 1075, 1084 (Fed. Cir. 2003), *aff'd*, 543 U.S. 631 (2005); *see Centech Group*, 554 F.3d at 1038 n.4 ("While not binding authority on this court, the decisions of the Comptroller General are instructive in the area of bid protests."); *Allied Tech. Group, Inc. v. U.S.*, 649 F.3d 1320, 1331 n.1 (Fed. Cir. 2011) (recognizing GAO's bid protest "expertise").

## B.    Introduction

The COFC erred in its conclusion that the PBACCs are cooperative agreements (and not procurement contracts). In its search for authority for HUD to enter into cooperative agreements under the Project-Based program, the COFC focused almost exclusively on the statutory history of the Housing Act. JA0021-

35.  At GAO and in the COFC, HUD argued that since the 1983 repeal of

Subsection (b)(2) of the Housing Act, its sole remaining authority to provide

Project-Based assistance was under Subsection (b)(1).  JA300/AR2598-2603;

JA0021-26.  HUD contended that it lacked the authority to enter into HAP

contracts directly with owners because Subsection (b)(1) compels it to enter into

ACCs with PHAs.  In response, Appellants demonstrated that, *inter alia*, HUD had

never made any such assertion outside of this litigation; that the 1983 Amendments

only precluded HUD from entering into *new* substantial rehabilitation and *new*

construction projects; and that HUD had continued to be a party to and renew HAP

contracts for 29 – now 30 – years in direct contravention to HUD's litigation

position that it was legally barred from doing so.  The COFC rejected HUD's

contention that its authority for Project-Based assistance had been narrowed to

Subsection (b)(1), JA0026-27, and agreed with Appellants that the 1983

Amendments did not extinguish the authority for projects previously established

under Subsection (b)(2).  *Id*.

The COFC did find that there was sufficient authority in the Housing Act

such that HUD could use an assistance agreement.  But, *this is merely a threshold

determination*.  As GAO's authoritative Redbook notes, "[o]nce the necessary

underlying authority is found, the legal instrument (contract, grant, or cooperative

agreement) that fits the arrangement as contemplated must be used, using the

31

statutory definitions for guidance as to which instrument is appropriate."

Principles of Federal Appropriations Law, vol. II, §B.2, at 10-17 (2006)

("Redbook").  Unfortunately, the COFC largely ignored the fundamental question

presented by the FGCAA: what is the "principal purpose" of the instrument in

question, i.e., the PBACC?  The court instead erroneously substituted its statutory

authority analysis for the analysis required by the FGCAA.

Assuming for the sake of argument that the PBACCs are cooperative

agreements, the COFC erred in failing to consider whether, under the APA, the

anticompetitive restrictions in the NOFA were arbitrary and capricious.  The

Tucker Act requires this analysis, and a faithful application of it would be fatal to

the NOFA's anticompetitive restrictions.

### C.   Because the PBACCs Are Procurement Contracts (And Not Cooperative Agreements) Under the FGCAA, The COFC's Judgment Must Be Reversed

The COFC's FGCAA analysis is flawed for several reasons.  The COFC, for

example, did not give proper consideration to the "principal purpose" question

required to be answered by the FGCAA and failed to examine the nature of the

instrument in question.  The COFC also completely ignored GAO's reasoned and

rational decision, including its findings that the PBACCs created an intermediary

relationship and therefore are procurement contracts.  In addition, what little

analysis the COFC did provide of the FGCAA was fundamentally flawed.  The

record makes clear that the PBACCs' real purpose is to provide services for

HUD's direct benefit and/or use.

### 1.    The PBACCs Are Procurement Contracts.

The FGCAA prescribes the criteria agencies must use in selecting among the

three available types of legal instruments: procurement contracts, grants and

cooperative agreements.  31 U.S.C. § 6301(2).  In pertinent part, the FGCAA, 31

U.S.C. §§ 6303-05, states:

**Sec. 6303. Using procurement contracts.**

An executive agency shall use a procurement contract as the legal
instrument reflecting a relationship between the United States Government
and a State, a local government, or other recipient when –

(1) **the principal purpose** of the instrument **is to acquire** (by
purchase, lease, or barter) **property or services for the direct benefit
or use** of the United States Government[.]  [Emphasis added.]

**Sec. 6304. Using grant agreements.**

An executive agency shall use a grant agreement as the legal instrument
reflecting a relationship between the United States Government and a State,
a local government, or other recipient when  –

(1) **the principal purpose** of the relationship **is to transfer a thing of
value** to the State or local government or other recipient **to carry out a
public purpose of support or stimulation** authorized by a law of the
United States **instead of acquiring** (by purchase, lease, or barter) **property
or services for the direct benefit or use** of the United States Government;
and

(2) **substantial involvement is not expected** between the executive
agency and the State, local government, or other recipient when carrying out
the activity contemplated in the agreement.  [Emphasis added.]

**Sec. 6305. Using cooperative agreements.**

An executive agency shall use a cooperative agreement as the legal instrument reflecting a relationship between the United States Government and a State, a local government, or other recipient when -

(1) **the principal purpose** of the relationship **is to transfer a thing of value** to the State, local government, or other recipient **to carry out a public purpose of support or stimulation** authorized by a law of the United States **instead of acquiring** (by purchase, lease, or barter) **property or services for the direct benefit or use** of the United States Government; and

(2) **substantial involvement is expected** between the executive agency and the State, local government, or other recipient when carrying out the activity contemplated in the agreement.  [Emphasis added.]

Grants and cooperative agreements, which constitute "assistance agreements," are closely related with the only significant difference between them involving the degree to which the Government will be involved in carrying out the activity being funded.  *See* GAO Redbook, vol. II, at 10-15; *Council on Environmental Quality*, B-218816, June 12, 1986, 65 Comp. Gen. 605, 1986 U.S. Comp. Gen. LEXIS 1039, *5 n.2 ("The principal difference [between a grant and a cooperative agreement] is that a grant does not usually involve substantial participation by the Federal agency (31 U.S.C. §6304). 'Substantial involvement' is expected when cooperative agreements are used. 31 U.S.C. §6305(2).").  Only after it is determined that an assistance agreement is appropriate, does one turn to the question of "substantial involvement" to distinguish between a grant and a cooperative agreement.  GAO Redbook, vol. II, at 10-15.

The FGCAA's plain language provides that if "the principal purpose[8] of the instrument is" for the Government "to acquire … property or services" for its own "direct benefit or use," a procurement contract is required.  31 U.S.C. §6303(1).  If "the principal purpose … is to [(1)] transfer a thing of value" to (2) "carry out a public purpose of support or stimulation," (3) "instead of acquiring … property or services for the direct benefit or use" of the Government, then an assistance agreement is appropriate.  31 U.S.C. §§6304(1), 6305(1).

Agencies have the inherent authority to use procurement contracts, and upon determining that an instrument's principal purpose is for the Government to acquire property or services for its own benefit or use, the analysis ends.  JA300/AR2851 n.20 (citing GAO's Redbook, vol. II, at 10-17)).  In contrast, for an assistance agreement to be appropriate, Congress must have provided statutory authority for the agency to use an assistance agreement, *id.*, and the FGCAA's principal purpose test must be fulfilled.

### a.   The PBACC's Terms and the Record Confirm That It's Principal Purpose is for HUD to Acquire Services for HUD's Direct Benefit rr Use

The PBACCs clearly require the PBCAs to provide services.  For example, the proposed 2012 PBACCs state that "[t]he PHA shall provide contract

---

[8] The COFC incorrectly observed that "the FGCAA establishes **a** 'principal purpose' test," JA0035 (emphasis added), while the NOFA also erroneously references "**a** 'principal purpose.**"  JA0014-15 (emphasis added).

administration services for Covered Units during the initial ACC Term."

JA300/AR126.  Since it began the PBCA initiative in 1999, HUD has consistently

called this a contract for services.  *See* JA300/AR428 ("Through this RFP, HUD is

seeking sources interested in providing contract administration services for project-

based Housing Assistance Payment Contracts under Section 8.").  Under the

PBACCs, the PBCA provides routine administrative services and has very little

discretion or authority.  *See supra* 11-13.

Throughout this protest litigation, HUD has avoided any meaningful

discussion of the terms of the PBACCs or of the contemporaneous record

describing those contracts.  Rather, HUD's litigation position has been to rely on

the broad "Declaration of Policy" language set forth in Section 2 of the Housing

Act of 1937 (42 U.S.C. §1437(a)(1)), as supplying the "principal purpose" for the

PBACCs.  For example, when asked to supply documents reflecting its

"determination of the principal purpose" of the PBACC, HUD responded by

simply quoting a portion of this statutory Declaration of Policy and stating:

"Therefore there are no documents responsive to this request."  A300/AR1124.

Consequently, by HUD's own admission, there are no documents in the

record supporting HUD's determination that the PBACCs are cooperative

agreements, other than those HUD has generated in litigation.  Not only are there

no documents in the record reflecting that such a determination was properly made,

but there are no documents prior to the 2011 bid protests that even use the term "cooperative agreement" to describe the PBACCs.  To the contrary, the record is replete with documents clearly describing the PBACCs as services contracts and noting that HUD was acquiring those services to relieve a burden on HUD's staff and to improve HUD's oversight of the program.

The documents in the record describing the 15 year history of the PBCA initiative leave no doubt as to the purpose of the PBACCs from inception.  First, HUD desired to reduce the burden on its own staff; second, it sought to improve its oversight of the Project-Based HAP contracts.  *See supra* at 8-9, 16-17.

In 1997, as part of the Clinton Administration's Reinventing Government initiative, HUD announced a "2020 Management Plan" to "stamp out waste, fraud and abuse and improve performance," and a key component of the effort included "[r]educing the size of HUD's staff from the current 10,500 to 7,500 by the end of the year 2000."  JA300/AR2766.  HUD also was failing in its management and oversight of the HAP contracts.  As GAO noted in 1998, HUD was suffering from management problems, including inadequate staffing, particularly in the FHA.  JA300/AR247.

In a March 1999 report, GAO noted that one of the key tools for HUD to meet these goals was to contract out portions of the administration of the HAP contracts.  JA300/AR253.  According to HUD, outsourcing would "relieve HUD

37

field staff of many duties they currently perform." *Id.*; *see also* JA300/AR2764

("With the downsizing of staff and changes in organization, HUD sought new

ways to conduct its business such as the [1999] Request for Proposals for outside

contractors to administer HUD's portfolio of Section 8 contracts.").

In its FY 2000 budget request, HUD sought an additional $209 million to

pay for this outsourcing program to "relieve HUD staff of many duties they

currently perform." JA300/AR253. HUD noted that the contract administrators

will "improve the oversight of HUD's project-based program," JA300/AR258-59,

and that it "plans to **procure** the services of contract administrators to assume

many of these specific duties, in order to release HUD staff for those duties that

only government can perform and to increase accountability for subsidy

payments." *Id.*

HUD's 1999 RFP states that it "pays billions of dollars annually to owners

on behalf of eligible property residents. HUD seeks to improve its performance of

the management and operations of this function through this RFP." A300/AR428

(emphasis added). The RFP also advised that it would evaluate the proposals "to

determine which offerors represent the best overall value … to the Department."

JA300/AR442 (emphasis added).

HUD has consistently described its objectives to Congress in its annual

budget requests, noting as recently as 2013 that "PBCAs have helped make HUD a

leader among Federal agencies in reducing improper payments," JA300/AR1963
(emphasis added), and that "PBCAs are integral to the Department's efforts to be
more effective and efficient in the oversight and monitoring of this program."
JA300/AR1960 (emphasis added).

Subsequent to the 1999 award of the PBACCs, HUD and other federal
agencies continued to discuss the PBCA program in procurement terms, and
consistently described their dual purpose as reducing a burden on HUD's staff and
improving HUD's oversight of the program.  For example, a 2007 GAO report
noted that "[i]n 1999, HUD began an initiative to contract out the oversight and
administration of most of its project-based contracts."  JA300/AR841.  That GAO
report noted that HUD elected to outsource these functions "because of staffing
constraints (primarily in HUD's field offices) and the workload involved in
renewing the increasing numbers of rental assistance contracts reaching the end of
initial terms."  *Id*.  GAO characterized the PBCAs as entities HUD "hired."  *Id*.  As
recently as 2009, HUD's Inspector General noted that HUD "outsourced" certain
of its functions to PBCAs.  A300/AR465.

HUD continued to describe the PBACCs as contracts with the PBCAs for
these same purposes.  JA300/AR1960 ("Through this set-aside, the Department
funds contracts with [PBCAs].").  HUD also described the PBCAs' functions and
relationship to HUD:

> These administrators … are responsible for conducting on-site management reviews of assisted properties; administering contract rents; reviewing, processing of, and paying monthly vouchers submitted by owners.  PBCAs are integral to the <u>Department's efforts</u> to be more <u>effective and efficient in the oversight and monitoring</u> of this program.

*Id*. (emphasis added).

HUD also stated that, "[t]he program set-aside of $260 million for PBCAs is an important tool to administer the program in a cost-effective manner….  PBCAs <u>have helped make HUD a leader</u> among Federal agencies in reducing improper payments."  JA300/AR1963 (emphasis added).  HUD's budget requests also make clear that the role of the PBCAs is to "support" HUD's Field Staff.  A300/AR1964 ("Field Staff perform the following functions, with support from PBCAs, to administer the PBRA program").

Significantly, like all federal agencies, HUD is required to list all of its assistance programs in the Catalogue of Federal Domestic Assistance ("CFDA").  For decades, HUD has listed separately the HAP program.  JA300/AR1825-27.  The CFDA listing for the HAP program states that "assistance is paid by HUD to the owner[.]"  JA300/AR1825.  For FY 2012, the CFDA states that the obligations for the HAP program are $10,328,000,000.  JA300/AR1827.  In stark contrast, HUD had never listed the PBCA program in the CFDA until after litigation over the second nationwide competition commenced.  JA300/AR1836.  Even then, HUD stated that the range of "financial assistance" was "estimated $20 million per

40

month for entire program," JA300/AR1838, which is roughly equal to the

administrative fees paid under the PBACCs and does <u>not</u> include the housing

assistance payments – the actual assistance provided under the Section 8 program.

Each of these objective assessments by HUD of its PBCA program – outside

the context of litigation – make clear that the PBACCs' purpose is to support

HUD's staff and assist HUD with oversight and program monitoring.  Prior to

litigation over the second nationwide PBACC solicitation, there is no record

documentation in which HUD characterizes the PBACCs as "cooperative

agreements."  To the contrary, HUD's contemporaneous statements reinforce that

the PBACCs are separate from the actual assistance obligated through the HAP

contracts and that prior to litigation HUD did not consider the PBACCs to be

cooperative agreements.

Consequently, the PBACCs and the record demonstrate that through the

PBCA initiative HUD is acquiring services for its own direct benefit and/or use.

As demonstrated below, GAO reviewed this very question in detail and came to

the same conclusion.

**b.  GAO Applied the Proper Analysis and Correctly Found the PBACCs to Be Procurement Contracts**

GAO carefully reviewed the PBACCs and the record in light of the

FGCAA's requirements.  In particular, GAO analyzed and discussed in detail the

concept of an "intermediary," including the case law and GAO Redbook

provisions addressing this subject.  JA300/AR2847-51.  Although the COFC

acknowledged that GAO's decision relied on the application of the "intermediary"

concept, JA0016, the COFC gave little, if any, consideration to the GAO's

decision or reasoning on this point.

GAO considered HUD's arguments that the NOFA is consistent with the

broad Declaration of Policy in the Housing Act and is intended to "assist" PHAs

"to address the shortage of housing affordable to low-income families by providing

a thing of value, that is money, to the PHAs."  JA300/AR2848.  GAO rejected

HUD's arguments, finding instead that while the HAP payments are made through

a depository account called for under the PBACC, the PBCAs have no rights to or

control over the payments and that any excess funds and interest earned on HAP

funds are remitted to HUD or be invested per HUD requirements.  A300/AR2849.

*See also supra* 11-14.  Based on this and HUD's own statements, GAO found that

the PBCAs, "consistent with their role as contract administrators, act only as a

'conduit' for the payments."  A300/AR2849.

GAO also rejected HUD's assertion that the administrative fee, which HUD

pays to the PHA, was a "thing of value" being provided to assist PHAs in the

performance of their mission.  *Id.*  Instead, GAO found that the record

demonstrated that "the administrative fees are paid to the PHAs as compensation

for their provision of service – i.e., administering the HAP contracts."

42

A300/AR2849-50.  In particular, GAO noted that the PBACCs state that "[t]he

PHA shall use the Administrative Fees to pay the operating expenses of the PHA

to administer the HAP Contracts."  *Id*., citing JA300*/*AR1363.

Finally, GAO rejected HUD's argument that HUD was not under any

obligation to administer the HAP contracts.  A300/AR2850.  GAO specifically

discussed the terms of the HAP contracts and HUD's official guidance, such as its

Occupancy Handbook, and found that HUD is "legally obligated to pay the

property owners under the terms of the HAP contracts."  *Id*.; *see* JA300/AR2269,

2276.  GAO also noted "HUD's recognition that it has primary responsibility for

contract administration but has assigned portions of these responsibilities to

PHAs."  *Id.*; *see* JA300/AR2137.

GAO found that "the asserted 'public purpose' provided by the PHAs under

the NOFA – the administration of the HAP contracts – is essentially the same

purpose HUD is required to accomplish under the terms of its HAP contracts,

wherein HUD is ultimately obligated to the property owners."  A300/AR2851.

GAO further found that

> the NOFA provides, and HUD's past practices demonstrate, that if a
> PHA is unable to provide contract administration services for the
> Project-Based Section 8 rental assistance program HUD staff has
> provided and will provide such services.  *See 360Training.com v.
> United States* (an **agency is acquiring the intermediary's services
> for its own direct benefit or use if the agency would otherwise
> have to use its own staff to provide the services offered by the**

> **intermediary**); *see also* GAO, Principles of Federal Appropriations
> Law, Vol. II, at 10-20.  [Emphasis added.]

JA300/AR2851.  As a result, GAO concluded that "the principal purpose of the

NOFA and PBACCs to be awarded under the NOFA is for HUD's direct benefit

and use."  *Id.*

Despite the fact that the GAO decision was before the COFC and that

protesters specifically briefed and discussed the intermediary issue in their briefs,

JA5741-46, JA5908-09, JA5994-95, the COFC simply ignored this controlling

issue.

In addition to this very case, GAO has addressed the FGCAA's application

in similar contexts with some frequency.  *E.g., Rocketplane Kistler*, B-310741, Jan.

28, 2008, 2008 CPD ¶22, at 4 ("the Agreement's purpose should control"); *see*

*Energy Conserv. Devices*, B-260514, June 16, 1995, 95-2 CPD ¶121, at 2; B-

227084, Oct. 15, 1987, 67 Comp. Gen. 13, at 2.  GAO's recognized bid protest

expertise is appropriately considered by this Court, and is particularly relevant

given its expertise with the specific subject matter.  *See Allied Tech. Group*, 649

F.3d at 1331 n.1; *IDEA Int'l, Inc. v. U.S.,* 74 Fed. Cl. 129, 136 n.11 (2006).

Appellants' position and the GAO's conclusions here are directly supported

by GAO's Redbook, *i.e.*, Principles of Federal Appropriations Law, vol. II, §B.2,

at 10-17 to 10-20 (2006), on which GAO heavily relied in its protest decision.

JA300/AR2846-2848, 2851 n.20.  The Supreme Court and this Court also have

relied frequently on GAO's Redbook.  *E.g.*, *Salazar v. Ramah Navajo Chapter*, 132 S. Ct. 2181, 2188-91, 2193-94 (2012); *Cherokee Nation v. Leavitt*, 543 U.S. 631, 642-43 (2005); *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993); *Star-Glo Assocs., LP v. U.S.*, 414 F.3d 1349, 1354 (2005); *Core Concepts of Fla., Inc. v. U.S.*, 327 F.3d 1331, 1338 (Fed. Cir. 2003).  As this Court has stated, the Supreme Court and Federal Circuit "have relied on the opinions of the [GAO], as expressed in Principles of Federal Appropriations Law …, and on the opinions of the Comptroller General, both of whose opinions, while not binding, are expert opinions, which we should prudently consider."  *Thompson v. Cherokee Nation*, 334 F.3d 1075, 1084 (Fed. Cir. 2003), *aff'd*, 543 U.S. 631 (2005); *see Star-Glo Assocs.*, 414 F.3d at 1354 ("recogniz[ing] that [GAO's] publication, Principles of Federal Appropriations Law … provides significant guidance").

### c.    The COFC Failed to Perform a Proper Analysis of the PBACCs and Misapplied the FGCAA

In stark contrast, the COFC's analysis of the core FGCAA question was remarkably brief and conclusory.  *See* JA0035-36.  In erroneously concluding that "the PBACCs are properly categorized as cooperative agreements under the standards set forth in the FGCAA," JA0036, the COFC did not cite to a single aspect of the PBACCs or discuss with any specificity the services being provided. The court's principal purpose discussion was relegated to three conclusory paragraphs, JA0035-36, and included no citations to the administrative record

45

much less the PBACCs.  The COFC's (minimal) analysis is contrary to the

FGCAA's requirements.

### 1.     The PBACCs Do Not Transfer "A Thing Of Value" Within the Meaning of the FGCAA

To qualify as an assistance agreement, the FGCAA requires that its principal

purpose must be to "transfer a thing of value" to the recipient.  31 U.S.C.

§§6304(1), 6305(1).  The COFC adopted HUD's erroneous position that HUD is

"'engaged in a core statutory duty of providing funding assistance to state-

sponsored PHAs'" and, consequently, concluded that the PBACCs' transfer a

"thing of value."  JA0036, citing JA5682.

The "thing of value" in the HAP Program is the *Housing Assistance*

*Payment*, which becomes a legal obligation by HUD under the "Housing

Assistance Payment" (i.e., HAP) contract – not the PBACC.  JA2849; *see supra* at

23-24, 44.  The COFC failed to consider this vital point.  HUD has acknowledged

the HAP contracts "represent the official point of obligation of federal funds" and

therefore "the attorneys for the Chief Financial Officer has (sic) determined HUD

MUST sign all HAP contract renewals."  JA6107 (emphasis in original); *see*

JA0033 (quoting HUD).  Because the PBACCs do not transfer a "thing of value"

to the PBCA, they cannot meet the statutory requirements for assistance

agreements.

Significantly, the assistance under the HAP Program is not provided "to state-sponsored PHAs," as the COFC erroneously suggests. JA0036 (quoting HUD Mem. at 22). Rather, HUD's own official documents state that <u>HUD</u> provides the assistance <u>to the project owners</u>. *See* JA300/AR1825 (CFDA: "the assistance is paid by HUD to the owner of an assisted unit.").

Other than the consideration paid in the form of the Administrative Fee for the services performed by the PHA, there is no "transfer of a thing of value" under the PBACCs. Therefore, under the FGCAA, the PBACCs are not, and cannot be, assistance agreements. The "thing of value" in the Project-Based Section 8 program is the HAP payment, which under the HAP contract is paid by HUD to the project owner (and not to the PHA). JA2849, *see supra* 23-24, 44; JA0033; JA300/AR1875. As demonstrated, HUD is a party to the HAP contract, HUD has the obligation to make the assistance payment under that contract, the HAP contract is the point of obligation for the assistance payment, and HUD retains control of the HAP payments. *See supra* 43-44. Consequently, the COFC's analysis is fatally flawed.

### 2.    The Services Provided by the PBACCs Are for HUD's "Direct Benefit or Use"

All three relevant FGCAA sections require consideration of whether the "principal purpose" of the instrument is "to acquire … services for the direct benefit or use by" HUD. 31 U.S.C. §§6303-05.

The COFC adopted HUD's litigation position that it "'has not and is not acquiring any services' but 'rather is engaged in a core statutory duty of providing assistance to state-sponsored PHAs[.]'" JA0036 (citing HUD Mem. 22).[9]  The first portion of this statement is simply incorrect.  The PHAs are undoubtedly providing services through the PBACCs which, if the PHAs did not provide, HUD would have to provide.  JA300/AR1321.  In the contemporaneous record, HUD admits that this is precisely what the PBACCs require: services.  JA6246; *see also* JA300/AR428.  *See supra* 8-9.

The latter portion of the COFC's statement is also incorrect as HUD is not providing assistance to the PHAs.  Rather, by its own admission, HUD provides assistance to the project owners on behalf of low income tenants.  JA300/AR1825.  As noted, given that the HAP contracts transfer the "thing of value" (i.e., the HAP payment), the consideration under the PBACCs is the administrative fee.  *See supra* 14-15. As expressly provided in the PBACCs, this fee is directly tied to the PHAs' services provided to HUD.  JA300/AR1363 ("The PHA shall use

---

[9] By giving greater weight to HUD's litigation arguments than to the contemporaneous record, the COFC failed to give proper consideration to the evidence before it.  *Gose v. USPS*, 451 F.3d 831, 838 (Fed. Cir. 2006) (agency interpretation advanced for the first time in litigation is "no more than a litigation position to which no deference is due") (and cases cited therein); *Macke Co. v. U.S.*, 467 F.2d 1323, 1325 (Ct. Cl. 1972) ("how the parties act under the arrangement, before the advent of controversy, is often more revealing than the dry language of the written agreement by itself").

Administrative Fees to pay the operating expenses of the PHA to administer HAP

Contracts.").

Consequently, there is no doubt that HUD is acquiring services and doing so

for its own direct benefit.  This was precisely GAO's finding.

### 3.    The COFC Failed to Properly Consider GAO's Decision and the Reasoning Supporting It

The COFC erred in adopting HUD's litigation position with only conclusory

analysis of the PBACCs' principal purpose.  GAO properly undertook a detailed

principal purpose analysis, including the intermediary situation, where "an

assistance relationship … is authorized to specified recipients, but the Federal

grantor delivers the assistance to the authorized recipients by utilizing another

party."  JA300/AR2847 (citing GAO's Redbook, vol. II, at 10-19).  Because HUD

is delivering the HAP payments to the property owners and merely using the PHAs

as a conduit, GAO noted that "the choice of instrument for an intermediary

relationship depends solely on the principal federal purpose in the relationship with

the intermediary," not the statutory authority to enter into that relationship on

which the Court focused.  *Id.*

As GAO reasoned, where the Government's principal purpose is to

"acquire" an intermediary's services, which ultimately may be delivered to an

authorized recipient, or if the agency would have to use its own staff to provide the

services (offered by the intermediary to the beneficiaries), then a procurement

contract is the proper instrument. JA300/AR2847; citing *360Training.com, Inc. v. U.S.*, 106 Fed. Cl. 575, 580 (2012). A proper FGCAA analysis by the COFC would have resulted in the same conclusion. Instead of reviewing, as required by the FGCAA, the PBACCs' terms and the record to determine whether a procurement contract or a cooperative agreement was appropriate, the COFC considered only HUD's statutory argument and completely ignored the intermediary question.

### 4. The COFC Improperly Relied on the Housing Act's Hortatory Language to Trump the FGCAA

The COFC relies on the "Declaration of Policy" in the 1937 Housing Act, Pub.L.No. 75-412, 50 Stat. 888, 891 (1937), 42 U.S.C. §1437(a), and states that the 1998 "revisions" to this language "'further emphasiz[e] the primary role the states and their political subdivisions are to play" in implementing federal housing policy. JA0034-35 (citing HUD Mem. at 14 and 112 Stat. 2461, 2522-23 (1998)). HUD and the COFC also appear to suggest that the 1998 Amendments were the impetus for the PBACC program. These positions are incorrect.

First, nothing in the record supports the COFC's position that HUD's decision to outsource portions of the HAP contract administration was prompted by the 1998 Amendments. To the contrary, the record is clear that HUD's stated purposes for the PBACC initiative were to "relieve a burden on HUD's staff" and to improve HUD's efficiency and oversight. *See supra* 8-9.

Second, the portions of the 1998 Amendments to the Housing Act cited by the COFC were not substantive and did not represent a shift in program responsibility. These Amendments merely reiterated the same broad "Declaration of Policy" originally set forth in the Housing Act as enacted in 1937. *See* Pub.L.No. 105-276, §505, 112 Stat. 2461, 2522-23 (1998). This is obvious from the two quotes the COFC provided, JA0034, which make it clear that the 1998 Amendments merely broke the statements set forth in the original text into bullet points and otherwise made only stylistic changes.

Third, in the extensive record, HUD makes no mention of these broad statutory purpose provisions as creating the impetus for the PBCA initiative and the PBACCs.

Finally, the COFC relied on this broad statutory purpose language to conclude that HUD was "unburdened by any statutory or regulatory obligation to maintain" direct administrative responsibility for the HAP contracts. JA0036. This serious misstatement also ignores the fact that HUD continues to remain a direct party to the HAP contracts and that HUD has an on-going contractual obligation under the HAP contracts. JA300/AR2270, 2276. As noted by GAO (*infra* 43-44), HUD still has the primary obligations under the HAP contracts, including the obligation to make the HAP payments; HUD has the "primary responsibility for contract administration" and HUD must assume these obligations

51

if the PHA fails to perform its contract administration function.  JA300/AR1704.

GAO's findings were supported directly by the terms of the HAP contract

(JA300/AR2269, 2276) and HUD's own Occupancy Handbook (JA300/AR2137)

both of which the COFC ignored.

## 5.    The COFC Rejected HUD's Stated Basis for Limited Award of PBACCs to PHAs, But Then Embraced It

Throughout these protests, both at GAO and at the COFC, HUD has

maintained that Subsection (b)(1) of the Housing Act serves as the basis for its

limiting award of PBACCs to PHAs, and argued that Subsection (b)(1) requires

HUD to use PHAs.  JA300/AR2598-2603.  When HUD finally listed the PBCA

program in the CFDA after the 2011 GAO protests, it mimicked its own litigation

position: "The PBCA program furthers these policies by effectuating authority

explicitly under section 8(b)(1) of the 1937 Act[.]"  JA300/AR1836.

In its decision, the COFC explicitly rejected HUD's reliance on Subsection

(b)(1) as a basis for awarding the PBACCs.  JA0026-27.  Notwithstanding this

clear rejection of HUD's position, the COFC went on to rely on it by stating "as

HUD correctly points out, it has always limited the award of the PBACCs to PHAs

and has done so under the express reasoning that '[b]y law, HUD may only enter

into an ACC with a legal entity that qualifies as a [PHA.]'" JA0035 (citing

JA300/AR428-29, 64 Fed.Reg. at 27358-59).  Having implicitly re-embraced

HUD's position that limiting competition based on Subsection (b)(1) is

appropriate, the COFC stated that it "does not see how such a restriction would apply" if HUD were obtaining the services strictly for its own convenience. JA0035.

In addition to be self-contradictory, the COFC's decision is premised on the notion that, because HUD may not have followed the rules in the past, it should not be required to follow them now.  The FGCAA does not permit such a position.

While Appellants are all PHAs, who admittedly derive some potential benefit from the PHA-only limitation, they all acknowledge that a consequence of a finding that the PBACCs are procurement contracts is that HUD will likely be required to use full and open competition.  For its part, HUD has admitted that it has not given any real consideration to whether the PHA-only restriction would be permitted under the procurement laws.  JA300/AR1151; JA300/AR2851-52. Recalling that the 2011 Invitation and the 2012 NOFA represent HUD's first attempt at re-competing the PBACCs, it is worth noting that, in 2011, **66 GAO protests were filed** asserting, at least implicitly, that the PBACCs are procurement contracts because, without that status, GAO would not have had jurisdiction over the protests.  JA300/AR2843.  In 2012, all 42 PBACCs covered by the NOFA were protested at GAO and the GAO found that they were in fact procurement contracts. JA300/AR2851.

### 6.    The COFC Misapplied the FGCAA's "Substantial Involvement" Requirement.

The COFC apparently adopted HUD's erroneous position that "substantial involvement on the part of the Government part is indicative of a cooperative agreement, not a procurement."  JA0036 (citing HUD Mem at 32).  This is a misinterpretation of the FGCAA.  The "substantial involvement" test is a differentiator applied <u>only</u> in distinguishing between a grant and a cooperative agreement.  *See Council on Environmental Quality,* B-218816, June 12, 1986, 65 Comp. Gen. 605, 1986 U.S. Comp. Gen. LEXIS 1039, \*5 n.2; *compare* 31 U.S.C. §§6304(2), 6305(2) *to* 31 U.S.C. §6303.  The COFC incorrectly suggested that "substantial involvement" necessarily indicates something other than a procurement contract exists.  *See* B-257430, Sept. 12, 1994, 1994 U.S. Comp. Gen. LEXIS 887, at \*13.

Moreover, by HUD's and the COFC's own admissions, HUD "has retained authority to make certain decisions <u>and to control the administration of the program</u>."  JA0036 (citing HUD Mem at 36) (emphasis added).  This "substantial involvement" is merely a reflection of the fact that the Project-Based program is and always has been HUD's responsibility and it is merely relying on the PHAs to provide services to support its own efforts.

**D.    Because the COFC Failed to Review the NOFA's Anticompetitive Restrictions Under the APA, The COFC's Judgment Must Be Reversed or Vacated.**

The COFC correctly found that it had jurisdiction to hear the protests under the Tucker Act.  JA0017-18.  Accordingly, the COFC is then required to determine, under APA standards and based upon the administrative record before it, whether the agency action at issue was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  28 U.S.C. §1491(b)(1), (4); 5 U.S.C. §706(2)(A); *see Impresa Construzioni Geom. Domenico Garufi v. U.S.*, 238 F.3d 1324, 1332 (Fed. Cir. 2001).  However, the COFC failed to make the required determination.  Therefore, the COFC's judgment must be reversed or vacated.

Appellants repeatedly demonstrated that, even if the PBACCs were cooperative agreements, the NOFA's anticompetitive restrictions – *i.e.*, effectively precluding PHAs, including Appellants, from being considered for award in any state other than their home state and, in numerous jurisdictions, allowing only the in-state HFA to be eligible for award – were arbitrary and capricious, in violation of the APA.  Before the COFC, Appellants offered detailed arguments on this subject, with substantial legal support and citation to the administrative record,

A6000-04, JA6429-6438, but the COFC failed to acknowledge, address or rule

upon these arguments in its April 19 decision at issue here.[10]

For example, Appellants specifically argued that: the AG letters on their face

were flawed, JA5749, 6001-03, 6435-36; HUD unreasonably imposed a

nationwide anticompetitive restriction despite having AG letters for only 6 of 42

states, only 2 of which actually provide substantive state law support for the

restriction, JA6435; HUD failed to document the basis for the competition

restrictions in the administrative record[11] and its protest arguments were merely

*post hoc* litigation positions, JA6411, JA6431, JA6437, *CRAssociates, Inc. v. U.S.*,

95 Fed. Cl. 357, 376 (2010); *see Motor Vehicle Mfrs. Ass'n v. State Farm Mut.*

*Auto. Ins. Co.*, 463 U.S. 29, 43, 49 (1983); HUD failed to consider Appellants'

arguments about the AG letters and the competition restriction, thus failing to

consider all aspects of the problem, JA6436; *360Training.com, Inc. v. U.S.*, 106

Fed. Cl. 177, 185 (2012) (*citing Ala. Aircraft Indus., Inc. v. U.S.*, 586 F.3d 1372,

1375 (Fed. Cir. 2009)); HUD failed to explain its departure from the "settled

---

[10] While the COFC summarizes the legal standards for APA review in two paragraphs of its April 19 opinion, JA0017-18, it otherwise does not reference the APA or indicate that it is applying the APA standard of review in either that opinion or its April 22 Order.

[11] HUD admitted this at oral argument before the COFC: "we don't think the record is developed to demonstrate why HUD has made the decision to go with, to defer to the states as to who can actually conduct business within their states." JA0277-78

course of behavior" of allowing cross-state competition, JA6437-6438; JA6388-6389; *Motor Vehicles Mfrs.,* 463 U.S. at 41-42; and federal law preempted any state law restrictions that might otherwise exist. JA6001-6002; JA6436; *Univ. of Colo. Found. v. American Cyanamid Corp.,* 342 F.3d. 1298, 1305 (Fed Cir. 2003). The COFC's April 19 decision does not address these issues or apply the APA standard of review to any of the NOFA's anticompetitive attributes.

The COFC decision makes passing reference to the AG letters: "[i]mmediately [after the 2011 protests] HUD began receiving a deluge of correspondence from various State Attorney Generals, offering opinions on whether their respective state law permits an out-of-state PHA to operate lawfully within its jurisdiction. In every case, the Attorney General opined that his or her state's laws did not permit such an operation." JA0014.[12] However, the COFC's summation of the letters is in error in nearly every respect, and the COFC does not assign any significance to them under the APA or otherwise.

First, HUD did not receive a "deluge" of AG letters as only one letter (Connecticut) was sent in connection with the 2011 protests. At the time it

---

[12] The COFC stated that "links to these various state attorney general letters," which were "transmitted to HUD," can be found at http://portal.hud.gov/hudportal/HUD?src=/program_offices/housing/mfh/PBCA%20NOFA. Several letters of these letters were directly included in the Administrative Record before the COFC. JA0014 n.7.

finalized the NOFA,[13] HUD had received no more than six letters (i.e., from Arizona, Connecticut, Delaware, Kentucky, New Mexico, and Oregon), and HUD initially posted only six letters on its website.  This is hardly a "deluge."

Second, the COFC also erroneously referred to these letters as "opinions", a precise legal term.  JA0014 & n 7.  In fact, at least two of the letters were merely "views" letters which are informal and non-binding (Arizona and Kentucky).  JA6596; JA6624.  Also, in many states, AG "opinions" are neither binding on, nor given any particular weight by, the state's courts.  *See, e.g.*, *Council 81, AFSCME v. Delaware*, 288 A.2d 453, 455 (Del. Ch. 1972) ("[A]n opinion of the Attorney General is advisory and thus not binding on those to whom it is given.").

Finally, the COFC erred in stating that "[i]n every case" the letters prohibited out-of-state PHAs from operating as "Public Housing Agencies".  JA0014.  Of the six letters HUD possessed when it finalized the NOFA, four said no such thing (Arizona, Connecticut, Delaware and New Mexico).  JA6596; JA6602; JA6606; JA6658.  Three of the four states (Connecticut, Delaware, and New Mexico) addressed whether an entity could serve as a "public housing **authority**" under the laws of their state – an entirely different legal term than a federal "public housing **agency**" set forth in the NOFA and the Housing Act (42 U.S.C. §1437a(b)(6)).  JA6602; JA6606; JA6658.  The fourth (Arizona) concludes

---

[13] *See* Feb. 16, 2012, email forwarding the NOFA, including the anticompetitive restrictions to OMB.  JA300/AR1474.

that federal law prevents out-of-state PHAs from operating in their state, a position

with which even HUD disagrees.  JA6596; *see* JA300/AR554 ("[N]othing in the

1937 [Housing] Act prohibits an instrumentality PHA that is 'authorized to engage

in or assist in the development or operation of public housing' within the meaning

of section 3(b)(6)(A) of the Housing Act from acting as a PHA in a foreign state.").

Contrary to the COFC's statement, at the time HUD issued the NOFA it had only a

single AG letter in hand (Oregon) which was an official attorney general opinion

that declared an out-of-state PHA could not serve in that state as a "public housing

agency" as defined by federal law.  JA6667; JA6671.

While the COFC's conclusion that the PBACCs are cooperative agreements,

if correct, may moot the application of CICA and the FAR, it did not obviate the

Tucker Act's requirement to examine the NOFA's anticompetitive restrictions

under the APA.  28 U.S.C. § 1491(b)(1), (4).  Significantly, the COFC's

jurisdiction over bid protests in this situation (and, consequently, its duty to

conduct the APA review) has been endorsed by the case law.  *E.g.*,

*360Training.com v. U.S.,* 104 Fed. Cl. 575, 585-88 (2012); *Ozdemir v. U.S.*, 89

Fed. Cl. 631, 638-39 (2009); *but cf. Resource Conservation Group, LLC v. U.S.*,

597 F.3d 1238, 1244-45 (Fed. Cir. 2010) (28 U.S.C. § 1491(b)(1) does not provide

COFC bid protest jurisdiction over solicitation for lessees for government-owned

property), cited in *360Training.com*, 104 Fed. Cl. at 577, 581-83. The COFC erred

in failing to give consideration to, and rule on, this issue particularly given

Appellants' detailed arguments and citations to authority.  Accordingly, the

COFC's judgment must be reversed or vacated.

It is true that, in response to Appellant CMS' "Emergency Motion For

Clarification Of The Court's April 19, 2013 Order And Request For Stay Pending

That Clarification Or, In The Alternative, Notice Of Intent To Appeal And Request

For Stay Pending Appeal," JA6335, the COFC issued an unpublished April 22

Order that stated:

> … CMS appears to seek clarification as to whether the Court's
> holding that the NOFA "is compliant with the FGCAA" applies to a
> provision in the NOFA that creates an in-state preference for the
> award of the contracts at issue in this case. It does. The FGCAA
> establishes only a precatory goal that agencies "encourage
> competition in making grants and cooperative agreements"; nothing in
> this Act mandates, as does the CICA, "full and open competition." 41
> U.S.C. § 3301(a)(1). Moreover, the contracts in the NOFA portfolio
> are "performance-based," and thus will, in fact, be awarded
> competitively, pursuant to numerous indicia specified in the terms of
> the NOFA.

JA0038-39.  This brief, conclusory and incomplete statement is insufficient

because it speaks only to compliance of the NOFA on its face with respect to the

FGCAA and fails to address Appellants' arguments that the NOFA's

anticompetitive restrictions are arbitrary and capricious and violate the APA or to

otherwise analyze the NOFA's anticompetitive restrictions under the APA.

Additionally, the "performance-based" nature of the PBACCs has nothing to do

with how they are awarded and everything to do with how they are administered
and how much the PHAs get paid.

Even if the COFC is somehow considered to have properly addressed
(which it did not) the anticompetitive restriction arguments concerning the NOFA
under the APA in its April 22 Order, JA0038-39, the COFC's judgment must still
be reversed or vacated. Assuming, *arguendo*, that the PBACCs are cooperative
agreements to which CICA and the FAR do not apply, as discussed above, the
NOFA's highly restrictive, anticompetitive requirements were arbitrary and
capricious under the APA because they eliminate competition. *See supra* 56-57.

Moreover, as noted, one purpose of the FGCAA is to "encourage
competition in making grants and cooperative agreements." 31 U.S.C. § 6301(3).
As we have demonstrated, the NOFA in no way "encourage[s] competition" and,
in fact, eliminates competition by: (i) permitting only one entity, the in-state HFA,
to compete for contract award in numerous jurisdictions, and (ii) precluding PHAs
-- which had previously competed successfully across state lines without restriction
-- from being considered for award in any state other than their home state. The
court's statement that "the contracts in the NOFA portfolio are 'performance-
based,' and thus will, in fact, be awarded competitively, pursuant to numerous
indicia specified in the terms of the NOFA" is nonsensical. We have demonstrated
that the NOFA contracts will not be awarded "competitively" unless competition

by only one offeror, and/or the elimination of competition by offerors' currently performing PBACCs at a high level fulfills the meaning of that term. Nor does the court identify the "numerous indicia" of competition in the NOFA. Unless the FGCAA's explicit language – "encourage competition" -- is meant to have no force and effect or is to be read out of the statute, then HUD must explain, and the administrative record must support, why HUD has completely disregarded it. *See Laguna Hermosa Corp. v. U.S.*, 671 F.3d 1284, 1290 (Fed. Cir. 2012) ("Our task is to interpret the statute as written, as we have, not to rewrite it."); *Thompson/Center Arms Co. v. U.S.*, 924 F.2d 1041, 1044 (Fed. Cir. 1991) (Court declines to read language out of a statute); *In re Mark Indus.*, 751 F.2d 1219, 1224 (Fed. Cir. 1984) ("A statute is by definition the law to be followed -- not disregarded, effectively repealed, rewritten, or overruled (unless unconstitutional) -- in the federal courts").

## VII.  CONCLUSION AND RELIEF REQUESTED

For the above reasons, Appellants respectfully request that this Court reverse or vacate the judgment of the Court of Federal Claims.

June 7, 2013                           Respectfully submitted,

                                        /S/ Michael J. Schaengold
                                        Michael J. Schaengold
                                        PATTON BOGGS LLP
                                        2550 M Street, NW
                                        Washington, D.C.  20037
                                        Telephone:  (202) 457-6523
                                        Facsimile:  (202) 457-6315

mschaengold@pattonboggs.com

*Counsel for Plaintiff-Appellant
Navigate Affordable Housing
Partners on behalf of All Plaintiffs-
Appellants*

Of Counsel:
Robert K. Tompkins
Elizabeth M. Gill
PATTON BOGGS LLP
2550 M Street, NW
Washington, DC 20037
(202) 457-6000

Colm P. Nelson
Belcher Swanson Law Firm PLLC
900 Dupont Street
Bellingham, WA 98225
(360) 734-6390
Counsel for
CMS Contract Management Services &
The Housing Authority Of The City Of Bremerton

Michael R. Golden
PEPPER HAMILTON
600 Fourteenth Street, N.W.
Hamilton Square
Washington, DC 20005
(202) 220-1244
Counsel for
National Housing Compliance

Neil O'Donnell
Dennis Callahan
ROGERS JOSEPH O'DONNELL
311 California Street
10th Floor
San Francisco, CA 94104

(415) 956-2828
Counsel for Assisted Housing Services Corp.,
North Tampa Housing Development Corp., &
California Affordable Housing Initiatives, Inc.

Richard Vacura
Tina D. Reynolds
K. Alyse Latour
MORRISON & FOERSTER LLP
1650 Tysons Boulevard
Suite 400
McLean, VA 22102
(703) 760-7764
Counsel for Southwest Housing Compliance Corp.

# **CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on this 7th day of June, the Plaintiffs-Appellants' Opening Brief was served upon all parties via the Court's electronic filing system.


/S/ Elizabeth M. Gill
Elizabeth M. Gill

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that the foregoing PLAINTIFFS-APPELLANTS' OPENING

BRIEF complies with the type-volume limitation of Federal Rule of Appellate

Procedure 32(a)(7)(B).  This BRIEF contains 13,941 words, excluding the parts of

the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), as

measured by the word processing software used to prepare this BRIEF.

June 7, 2013                          Respectfully submitted,

                                      /S/ Elizabeth M. Gill
                                      Elizabeth M Gill

**<u>ADDENDUM</u>**

# In the United States Court of Federal Claims

Nos. 12-852C, 12-853C, 12-862C, 12-864C, & 12-869C

(Filed: April 19, 2013)

| | |
|---|---|
| ************************************** * <br> CMS CONTRACT MANAGEMENT * <br> SERVICES; THE HOUSING AUTHORITY * <br> OF THE CITY OF BREMERTON; * <br> NATIONAL HOUSING COMPLIANCE; * <br> ASSISTED HOUSING SERVICES CORP.; * <br> NORTH TAMPA HOUSING * <br> DEVELOPMENT CORP.; CALIFORNIA * <br> AFFORDABLE HOUSING INITIATIVES, * <br> INC.; NAVIGATE AFFORDABLE * <br> HOUSING PARTNERS; SOUTHWEST * <br> HOUSING COMPLIANCE CORP.; and * <br> MASSACHUSETTS HOUSING FINANCE * <br> AGENCY, * <br> * <br> Plaintiffs, * <br> * <br> v. * <br> * <br> THE UNITED STATES, * <br> * <br> Defendant. * <br> ************************************** | Pre-award Bid Protests; Project-based HUD Section 8 Housing Assistance Program; Procurement Contracts Contrasted With Cooperative Agreements; 31 U.S.C. §§ 6301 - 6308; Applicability of Competition in Contracting Act and Federal Acquisition Regulation; Analysis of HUD Housing Assistance Statutes and Regulations. |

*Colm P. Nelson*, Foster Pepper PLLC, Seattle, Washington, for CMS Contract Management Services and the Housing Authority of the City of Bremerton.

*Neil H. O'Donnell*, with whom were *Dennis J. Callahan* and *Jeffrey M. Chiow*, Rogers Joseph O'Donnell, San Francisco, California, for Assisted Housing Services Corp., North Tampa Housing Development Corp., and California Affordable Housing Initiatives, Inc.

*Richard J. Vacura*, with whom were *Tina D. Reynolds* and *K. Alyse Latour*, Morrison & Foerster LLP, Washington, D.C., for Southwest Housing Compliance Corporation.

*Robert K. Tompkins*, with whom was *Elizabeth M. Gill*, Patton Boggs LLP, Washington, D.C., for Navigate Affordable Housing Partners.[1]

*Michael R. Golden*, with whom were *Michael A. Hordell*, *Heather Kilgore Weiner*, and *Samuel Jack*, Pepper Hamilton LLP, Washington, D.C., for National Housing Compliance.

*Gabe E. Kennon*, with whom was *Andrew Mohr*, Cohen Mohr LLP, Washington D.C., for Massachusetts Housing Finance Agency.

*Douglas K. Mickle*, with whom were *Joseph A. Pixley*, *Stuart F. Delery*, Principal Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Kirk Manhardt*, Assistant Director, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C.; *Dorie Finnerman*, Assistant General Counsel for Assisted Housing and Civil Rights, *Kathie Soroka*, Special Assistant to the General Counsel, and *Kasey M. Podzius*, U.S. Department of Housing and Urban Development, Washington, D.C., for Defendant.

*Kevin P. Mullen*, with whom was *Charles L. Capito III*, Jenner & Block LLP, Washington, D.C., for *amicus curiae* National Council of State Housing Authorities.

<u>OPINION AND ORDER</u>

WHEELER, Judge.

This consolidated bid protest involves five substantially equivalent suits challenging a 2012 Notice of Funding Availability ("NOFA") issued by the U.S. Department of Housing and Urban Development ("HUD"). The purpose of the NOFA is to fund HUD's Performance-Based Contract Administrator ("PBCA") Program for the administration of Project-Based Section 8 Housing Assistance Payment Contracts. HUD plans to award 53 state-wide contracts to Public Housing Authorities ("PHAs") for the oversight and administration of certain housing subsidy contracts with the private owners of multifamily housing projects. Plaintiffs are Public Housing Authorities and their non-profit subsidiaries and they allege that certain terms of the NOFA, in particular a preference given to in-state applicants, are in violation of the Competition in Contracting Act and the Federal Acquisition Regulation. The Government voluntarily has refrained from awarding the contracts pending the issuance of the Court's decision in this protest.

---

[1] When it entered this litigation, Navigate Affordable Housing Partners was known as Jefferson County Assisted Housing Corporation.

HUD does not dispute that the NOFA fails to meet the competitive requirements mandated by federal procurement laws and regulations. Instead, it argues that these requirements are inapplicable to the contracts it plans to award under the NOFA because they are not "procurement" contracts at all, but rather are assistance agreements outside the domain of procurement law. Based on this position, the Government moves to dismiss Plaintiffs' claims for lack of subject matter jurisdiction and, in the alternative, for judgment on the administrative record. The Plaintiffs oppose both of these motions and cross-move for judgment on the administrative record.

Reaching a decision in this matter has required the Court's review of a morass of arcane housing assistance statutes and regulations. After performing this review, and for the reasons explained below, the Court finds that the Government is entitled to judgment on the administrative record because the contracts in question are properly classified as cooperative agreements, not procurement contracts.

<u>Background</u>

In 1974, Congress amended the Housing Act of 1937 ("1937 Act" or "1937 Housing Act") to create what is known as the Section 8 Housing Program ("Section 8 Program"). <u>See</u> 42 U.S.C. § 1437f *et seq*; Housing and Community Development Act of 1974, Pub. L. No. 93-383, § 201(a), 88 Stat. 633, 662 (1974). Created "[f]or the purpose of aiding low-income families in obtaining a decent place to live and of promoting economically mixed housing," 42 U.S.C. § 1437f(a), the Section 8 Program provides federally-subsidized housing to millions of low-income families and individuals through a range of rental assistance programs, both tenant- and project-based. Under all types of Section 8 programs, tenants make rental payments based upon their income and ability to pay, and HUD then provides, under various delivery mechanisms, "assistance payments" to private landlords to make up the difference between the tenant's contribution and the agreed-upon "contract rent." 42 U.S.C. § 1437f *et seq.*; <u>see also</u>, <u>e.g.</u>, <u>Park Village Apartment Tenants Ass'n v. Mortimer Howard Trust</u>, 636 F.3d 1150, 1152 (9th Cir. 2011) (describing the program); <u>Park Props. Assocs., L.P. v. United States</u>, 82 Fed. Cl. 162, 164 (2008) (same).

The tenant-based Section 8 program, which is perhaps the better known of the two types of assistance, involves HUD's provision of a limited number of "Housing Choice Vouchers" to local PHAs throughout the country. The PHAs distribute the vouchers to eligible low-income individuals and families who may use the vouchers to help them obtain eligible private-market rental units of their choice,[2] within certain cost parameters. Generally, these vouchers are portable, in that the tenant may carry the benefit of the

---

[2] Eligible units are those that meet HUD-established standards for decent, safe, and sanitary housing and that are owned by a landlord willing to accept the voucher. <u>See</u> 42 U.S.C. § 1437f(f)(7) and (o); 24 C.F.R. § 982.1(b)(1).

3

voucher to a new rental unit should he or she decide to move.  24 C.F.R. Part 982; see also, e.g., Graoch Assocs. #33, L.P. v. Louisville / Jefferson Cnty. Metro Human Relations Comm'n, 508 F.3d 366, 380 (6th Cir. 2007) (Merritt, J. concurring) (explaining operation of tenant-based program); Langlois v. Abington Hous. Auth., 207 F.3d 43, 45 (2d Cir. 2000) (same).

The dispute in this case involves the second, lesser-known type of Section 8 assistance, which is project-based.  Like the voucher holders, beneficiaries of project-based Section 8 programs[3] make income-based rental payments, with the difference between that payment and the contract rent made up by the program.  However, as the name of this program suggests, project-based rental assistance is attached to specific units or buildings owned by private-sector landlords.  Thus, project-based assistance is not portable, and when a tenant vacates a subsidized unit, the benefit becomes available to the unit's next occupant.  See 42 U.S.C. § 1437f(f)(6).

The Section 8 Program has undergone many statutory revisions since its enactment in 1974, and a close examination of the revisions, as well as HUD's responses to the same, is necessary to the resolution of the issues now before this Court.  Accordingly, the Court will outline the most significant portions of this statutory and program history below.

---

[3] HUD asserts, and Plaintiffs do not contest, that there are seven separate project-based Section 8 programs directly at issue in this bid protest: (1) the Housing Assistance Payments ("HAPs") Program for New Construction (24 C.F.R. Part 880); (2) the HAPs Program for Substantial Rehabilitation (24 C.F.R. Part 881); (3) the HAPs Program for State Housing Agencies (24 C.F.R. Part 883); (4) the HAPs Program for New Construction Set-Aside for Section 515 Rural Rental Housing Projects (24 C.F.R. Part 884); (5) the Loan Management Set-Aside Program (24 C.F.R. Part 886 Subpart A); (6) the Housing Assistance Program for the Disposition of HUD-Owned Projects (24 C.F.R. Part 886 Subpart C); and (7) the HAPs Program for Section 202 Projects (24 C.F.R. Part 891).  See HUD Mem. at 5 n.4.

In addition, HUD asserts, and Plaintiffs do not contest, that two other project-based Section 8 programs, while not directly at issue in this case, bear the potential to be affected by its outcome: the Moderate Rehabilitation Program (24 C.F.R. Part 882 Subparts A – G); and the Moderate Rehabilitation Single Room Occupancy Program for Homeless Individuals (24 C.F.R. Part 882 Subpart H).  These programs are administered by HUD's Office of Public and Indian Housing and Office of Community Planning and Development, respectively.  See HUD Mem. at 5 n.4.

In the interest of simplicity, however, the Court will refer throughout this opinion to all of these programs collectively, and in the singular, as the "project-based Section 8 program."

4

I.    The Pertinent Statutes

A. The Housing and Community Development Act of 1974

As noted above, the Section 8 Program first came into being with the enactment of the Housing and Community Development Act of 1974, Pub. L. No. 93-383, § 201(a), 88 Stat. 633, 662 (1974) ("1974 Housing Act" or "1974 Act"), which amended certain provisions of the 1937 Housing Act.  At the time it was enacted, and as relevant to this case, Section 8, subsection (a) of this Act provided that "[rental] assistance payments may be made with respect to" three categories of housing: "[(1)] existing, [(2)] newly constructed, and  [(3)] substantially rehabilitated housing."  88 Stat. 662-63, codified at 42 U.S.C. § 1437f(a)(1).   Section 8, subsection (b), in turn, distinguished the proper administration of the program according to the type of housing in question, as follows:

(1) The Secretary is authorized to enter into annual contributions contracts with public housing agencies pursuant to which such agencies may enter into contracts to make assistance payments to owners of *existing* dwelling units in accordance with this section.  In areas where no public housing agency has been organized or where the Secretary determines that a public housing agency is unable to implement the provisions of this section, the Secretary is authorized to enter into such contracts and to perform the other functions assigned to a public housing agency by this section.

(2) To the extent of annual contributions authorizations under section 5(c) of this Act, the Secretary is authorized to make assistance payments pursuant to contracts with *owners or prospective owners who agree to construct or substantially rehabilitate housing* in which some or all of the units shall be available for occupancy by lower-income families in accordance with the provisions of this section.  The Secretary may also enter into annual contributions contracts with public housing agencies pursuant to which such agencies may enter into contracts to make assistance payments to owners or prospective owners.

88 Stat. 662-63 (emphasis added).

Thus, subsection (b)(1), which remains in effect as initially enacted, governs *existing* housing, and provides that in administering this segment of the Section 8 Program, HUD is, whenever possible, to enter into "annual contributions contracts" ("ACCs") with PHAs holding jurisdiction over the locality in question.  The PHAs, in turn, contract with owners of private housing "to make assistance payments … in accordance with this section."  This second contract, to which the owner is a party and through which that entity receives the assistance payment, is known as the Housing Assistance Payment ("HAP") contract.  24 C.F.R. § 880.201.  Under the terms of the

5

ACC, HUD provides the PHA with funds to cover (1) the housing assistance payments that the PHA, through the HAP, makes to owners, and (2) the costs of the PHA's administrative services related to the program. 24 C.F.R. § 982.151(a)(1). Importantly, under subsection (b)(1) HUD is authorized to bypass the PHA and enter directly into a HAP contract with an owner of existing housing *only* in jurisdictions where no qualified local PHA exists.

In contrast, subsection (b)(2), which has since been repealed – but which as explained below has enjoyed a rather complicated afterlife – governed both *new* and *substantially rehabilitated* housing. Under subsection (b)(2), HUD could subsidize low-income housing by *either* (i) entering into HAP contracts directly with owners or prospective owners of multifamily housing, including, in some instances, PHAs that themselves built or rehabilitated qualifying housing ("sentence one" projects), *or* (ii) establishing ACCs with local PHAs, pursuant to which the PHAs would, in turn, enter into HAP contracts with the owners or prospective owners of multifamily housing ("sentence two" projects). Thus, subsection (b)(2) authorized three possible, and non-exclusive, program designs: (1) private-owner / HUD projects, (2) PHA-owner / HUD projects, and (3) private-owner / PHA projects. See, e.g., 24 C.F.R. § 880.201 (noting these configurations).

At its inception, subsection 8(b)(1) was primarily intended to support tenant-based programs. In 1998, however, the Quality Housing Work Responsibility Act ("QHWRA"), Pub. L. No. 105-276, §§ 545, 550, relocated the authority for tenant-based programs to Section 8(o), codified at 42 U.S.C. § 1437f(o). However, subsection (b)(1) has also supported certain specific project-based programs.

With respect to subsection (b)(2), in the approximate decade following the enactment of the 1974 Act, HUD implemented its authority in, broadly speaking, two ways. First, under its "sentence one" authority, HUD entered into approximately 21,000 HAP contracts with owners who either constructed or substantially rehabilitated qualifying housing. Although HUD was authorized to enter into such contracts with both private owners and PHA-owners, as a matter of practice the vast majority of these "sentence one" HAP contracts were with private owners. See AR 1418, 53 Fed. Reg. 8050 (March 11, 1988) (noting that less than 10 percent of HUD's project-based HAP contracts were for PHA-owner / HUD projects). Pursuant to program regulations, HUD served as the "Contract Administrator" for all of these HAP contracts, the terms of which were generally 20 to 40 years. 24 C.F.R. § 880.201; 88 Stat. 665 (limiting HAP contracts to these terms unless owned or financed by a state or local agency); AR 1702 (HUD Occupancy Handbook).

Second, pursuant to its "sentence two" authority, HUD entered into ACCs with PHAs, which in turn entered into HAP contracts with private owners. Approximately 4,200 such HAP contracts originated in this manner. AR 428 (1999 Request for

6

Proposals, discussed below); HUD Supp. Mem. at 9-10. The PHAs served as the Contract Administrator for these HAP contracts. 24 C.F.R. § 880.201.

## B. The Housing and Urban-Rural Recovery Act of 1983

In 1983, Congress repealed the portion of Section 8 that provided ongoing authority for the inclusion of newly constructed and substantially rehabilitated housing within the program. Specifically, Section 209(a) of the Housing and Urban-Rural Recovery Act of 1983 ("HURRA") made two revisions to Section 8. First, it deleted the reference to "newly constructed, and substantially rehabilitated" housing in 42 U.S.C. § 1437f(a)(1). Second, it repealed entirely the then-existing version of 42 U.S.C. § 1437f(b)(2). Pub. L. No. 98-181, § 209(a)(1)-(2), 97 Stat. 1153, 1183 (1983).

However, while HURRA repealed HUD's authority to enter into any *additional* HAP contracts with owners or prospective owners of new or substantially rehabilitated housing (or to enter into ACCs with PHAs to do the same), it also included a savings provision that expressly preserved HUD's ability to continue funding the HAP contracts entered into pursuant to (b)(2) authority prior to the close of 1984. Specifically, Section 209(b) of HURRA provided that: "[t]he amendments made by subsection (a) shall take effect on October 1, 1983, except that the provisions repealed shall remain in effect … with respect to any funds obligated for a viable project under section 8 of the United States Housing Act of 1937 prior to January 1, 1984[.]" Id. § 209(b).

As is plain from the above, and as all parties agree, HURRA had no effect on HUD's authority to enter into ACCs with PHAs for existing housing pursuant to Section (b)(1) of the 1937 Act, and indeed, this authority remains intact today. 42 U.S.C. § 1437f(b)(1); see also HUD Mem. at 11. The parties further agree that HURRA did not – or at least not immediately – affect HUD's ability to continue its administration of the existing HAP contracts that HUD had entered into pursuant its now-expired (b)(2) authority. See HUD Mem. at 11 (following the enactment of HURRA, "HUD and PHAs under ACCs with HUD continued to have authority to administer existing HAP contracts that had been previously entered into for newly constructed and substantially rehabilitated housing"). Thus, in the aftermath of HURRA, "HUD … continued to administer those contracts to which it was a party, and PHAs continued to administer those contracts to which they were a party." HUD Reply at 10.

However, as discussed below, the parties sharply disagree as to HURRA's longer-term effect on the programmatic design of project-based Section 8 assistance.

7

C.  The Multifamily Assisted Housing Reform and Affordability Act of 1997

Pursuant to former Section 8(e)(1) of the 1974 Act, new construction and substantial rehabilitation HAP contracts (the "(b)(2)" contracts) were limited to terms of 20 to 40 years.  Pub. L. No. 93-383, 88 Stat. 633, 665.  Although some of these original contracts are still in existence today, most of them, with the passage of time, began to expire in the mid- to late-1990s.  To address this problem, in 1996 Congress authorized a handful of limited demonstration programs providing for the renewal of certain project-based HAP contracts.  See Pub. L. No. 104-99, Title IV, § 405, 110 Stat. 26 (1996); Pub. L. No. 104-120, § 2(a), 110 Stat. 834 (1996); Pub. L. No. 104-204, Title II, § 211, 110 Stat. 2874 (1996).

Then, in 1997, Congress enacted the Multifamily Assisted Housing Reform and Affordability Act ("MAHRA") in order to, *inter alia*, provide a permanent and generalized mechanism by which HUD could renew the expiring contracts.  Pub. L. No. 105-65, Title V, § 524, 111 Stat. 1384, 1408 (1997), 42 U.S.C. § 1437f note (Supp. III 1997).  As relevant to this case, § 524(a)(1) of MAHRA, entitled "Section 8 Contract Renewal Authority," provided that:

> [F]or fiscal year 1999 and henceforth, the Secretary may use amounts available for the renewal of assistance under section 8 or the United States Housing Act of 1937, upon termination or expiration of a contract for assistance under section 8 (other than a contract for tenant-based assistance …) to provide assistance under section 8 of such Act at rent levels that do not exceed comparable market rents for the market area.  The assistance shall be provided in accordance with terms and conditions prescribed by the Secretary.

("Section 524").  In 1999, Congress replaced this language with a provision stating that:

> [HUD's] Secretary shall, at the request of the owner of the project and to the extent sufficient amounts are made available in appropriation Acts, use amounts available for the renewal of assistance under section 8 of such Act to provide such assistance for the project.  The assistance shall be provided under a contract having such terms and conditions as the Secretary considers appropriate, subject to the requirements of this section.

Pub. L. No. 106-74, Title IV, Subtitle C, § 531(a), 113 Stat. 1047, 1109-10, 42 U.S.C. § 1437f note (2006).

Although certain other statutory provisions and amendments are relevant to this case, it is fair to say that the parties' basic dispute boils down to their competing

8

interpretations of HURRA and MAHRA – or more specifically, to their competing interpretations of how these two statutes interact with one another and the remainder of the 1937 Act.

HUD, for its part, makes two different arguments regarding this statutory overlay. Its first and primary argument begins with the premise that after HURRA's repeal of subsection 8(b)(2) in 1983, the agency's "statutory authority to enter into *new* rental assistance agreements survived only in Section 8(b)(1) of the Housing Act." HUD Reply at 7 (emphasis added). HUD further argues here that when HUD renewed the expiring (b)(2) contract pursuant to MAHRA, the renewal contracts were necessarily "'*new*' contracts for *existing* projects" – *i.e.*, executed pursuant to HUD's (b)(1) authority – as opposed to "mere 'extensions' of [the] HAP contracts" the agency originally had executed under its now-expired (b)(2) authority. Id. at 10 (emphasis added). In support of this theory, HUD offers various textual arguments, which the Court will discuss and analyze below. In the main, however, HUD's argument is that by the time it renewed the assistance for the projects initiated under subsection 8(b)(2), such projects had "been in existence for more than twenty years," and "common sense" therefore counsels that they were "'existing dwelling units,' as that phrase is used in Section 8(b)(1)." HUD Reply at 11-12.

The import of this argument derives from the fact that subsection (b)(1) instructs HUD to enter into ACCs with PHAs, which in turn enter into HAP contracts to provide assistance payments to owners. Under this provision, HUD is permitted to enter into a HAP contract directly with a project owner *only* when no qualified local PHA exists for a given jurisdiction. Thus, in HUD's words, "[i]f the Renewal contracts are new contracts under Section 8 of the 1937 Act, that Section 8 authority can only come from Section 8(b)(1), and as such, HAP contract administration lies only with a PHA." Id. at 12. Since all parties agree that "(b)(1)" ACCs between HUD and PHAs are properly considered cooperative agreements, this result would foreclose the Plaintiffs' claim that HUD must abide by procurement standards in its actions that are the subject of this suit.

The Plaintiffs offer various legal theories in opposition to this argument, but all agree on two central points. First, with respect to HURRA's repeal of subsection 8(b)(2), the Plaintiffs contend that "[t]here is nothing in the statutory language or legislative history at the time of th[is] repeal … or thereafter to indicate that Congress made any attempt to move any of HUD's repealed authority under the repealed [sub]section 8(b)(2) to [sub]section 8(b)(1), or that Congress ever repealed the savings clause." NHC Mem. at 5. Second, they argue that MAHRA neither "effect[ed] a transformation of projects established under [sub]section (b)(2) into 'existing housing' under [sub]section (b)(1)," nor "otherwise compel[led] HUD to solicit cooperative agreements to obtain HAP contract administration services." AHSC Reply at 7. To the contrary, the Plaintiffs contend that "HUD remained responsible [under subsection (b)(2)] for ensuring that HAP

9

contract administration was performed, either by itself or by contracting with a third party." Id.

HUD, however, also makes a second, alternative argument, to the effect that even if the Plaintiffs are correct that the contracts that are the subject of this suit are governed by (b)(2), nothing in that provision requires HUD to directly administer the renewal HAP contracts. As explained above, subsection (b)(2) consists of two sentences: the first grants HUD authority to enter into HAP contracts directly with project owners, and the second – which, it is worth noting, is effectively identical to subsection (b)(1) – grants HUD authority to enter into ACCs with local PHAs, which in turn enter into HAP contracts with project owners. Here, HUD contends that:

> even if HUD was a contract administrator under the initial [HAP] contract, the 1937 Act does not mandate that either HUD or a PHA enter into a HAP contract, and it does not mandate that either HUD or a PHA administer the HAP contract. [subs]ection (b)(2) provide[s] that either HUD or PHAs [may] be contract administrators…. Therefore, for contracts already in existence, HUD had discretion to choose between direct administration of HAP contracts and assignment of HAP contracts to PHAs for administration.

HUD Reply at 12.

The Plaintiffs, unsurprisingly, disagree, though their reasoning varies considerably from party to party. In the main, the Plaintiffs contend that MAHRA "commands HUD to enter into HAP renewals," CMS Reply at 11, and therefore obliges HUD to act as the contract administrator for the renewal contracts. As such, in contracting out this responsibility to the PHAs, Plaintiffs contend that HUD "is receiving a direct benefit" in the form of "services that HUD itself is otherwise required to perform," and is therefore engaged in a procurement activity under the standards of the Federal Grant & Cooperative Agreement Act, 31 U.S.C. §§ 6301-6308 ("FGCAA"). NHC Mem. at 24. The Court will analyze these arguments below, but first turns to the program and procedural history underlying this bid protest.

II.    Factual and Procedural History

    A. "HUD 2020" Reforms and the 1999 Request for Proposals

On June 26, 1997, then-HUD Secretary Andrew Cuomo announced an agency-wide management reform plan called "HUD 2020." AR 2766. Among the key reforms announced in this plan was a commitment to cut HUD's staff by nearly one-third, "from the current 10,500 to 7,500 by the end of the year 2000." Id. Four months later, on October 27, 1997, Congress enacted MAHRA, instituting (among other reforms) the

10

renewal authority for project-based Section 8 assistance outlined above. Consistent with Secretary Cuomo's "HUD 2020" reform plan, MAHRA's "Findings and Purposes" observed that "due to Federal budget constraints, the downsizing of [HUD], and diminished administrative capacity, the Department lacks the ability to ensure the continued economic and physical well-being of the stock of federally insured and assisted multifamily housing projects." MAHRA § 511(10). Congress further stated that MAHRA was intended to address such problems by introducing "reforms that transfer and share many of the loan and contract administration functions and responsibilities of the Secretary to and with capable State, local, and other entities." Id. § 511(11)(C).

In March 1998, HUD's Office of Inspector General ("OIG") informed Congress that as part of its "extensive reorganization under [the] HUD 2020 Management Plan," the agency would issue a "Request for Proposals for outside contractors to administer HUD's portfolio of Section 8 contracts." AR 2763 (internal Advisory Report on Section 8 Contract Administration, issued October 26, 1998, summarizing the March 1998 OIG Semiannual Report to Congress). Thereafter, HUD's Fiscal Year 2000 Budget Request included a request for $209 million to fund an initiative to assign contract administration of its project-based HAP contracts to state-based governmental agencies. AR 256, 258-59. The Budget Request stated that HUD "plan[ned] to procure the services of contract administrators to assume [contract administration] duties, in order to release HUD staff for those duties that only government can perform and to increase accountability for subsidy payments." Id. at 259. The Budget Request further stated:

> The Department would solicit for competitive proposals from eligible public agencies to assume these contract administration duties…. The solicitation would specify exact duties, performance measures, and the method of selection and award. The evaluation would be based upon the respondent's capabilities and proposed contract prices.

Id.

True to its word, on May 3, 1999, HUD issued a Request for Proposals ("RFP") for "Contract Administrators for Project-Based Section 8 Housing Assistance Payments (HAP) Contracts" ("1999 RFP"). AR 428 et seq., 64 Fed. Reg. 27,358 (May 19, 1999). The 1999 RFP stated that "[t]his solicitation is not a formal procurement within the meaning of the Federal Acquisition Regulations (FAR) but will follow many of those principles," and sought proposals "to provide contract administration services" for "most of" the approximately 20,000 project-based Section 8 HAP contracts that HUD was, at that time, administering (i.e., the (b)(2) "sentence one" projects). Id. Although the RFP was initially limited to the "sentence one" projects, it expressly noted the existence of an additional 4,200 projects that were being administered by PHAs (i.e., the (b)(2) "sentence two" projects). The RFP stated that PHAs "will generally continue to administer these HAP Contracts until expiration….[but] [w]hen HUD renews [these contracts] … HUD

generally expects to transfer contract administration of the renewed HAP Contracts to the Contract Administrator (CA) it selects through this RFP for the service area where the property is located." Id.

The RFP specified that the contract administration duties would be performed pursuant to a performance-based ACC ("PBACC"[4]) entered into with HUD, that "[b]y law, HUD may only enter into an ACC with a legal entity that qualifies as a "public housing agency" (PHA) as defined in the United States Housing Act of 1937 (42 U.S.C. [§] 1437 *et seq.*),"[5] and that responsive proposals would "cover an area no smaller than an individual State (or U.S. Territory)." AR 428-29, 64 Fed. Reg. at 27,358-59.

The RFP further provided that:

successful offerors under this RFP will oversee HAP Contracts, in accordance with HUD regulations and requirements…. After execution of the ACC, the CA [*i.e.*, Contract Administrator] will subsequently assume or enter into HAP Contracts with the owners of the Section 8 properties. The Contract Administrator will monitor and enforce the compliance of each property owner with the terms of the HAP Contract and HUD regulations and requirements.

AR 428, 64 Fed. Reg. at 27,358. Further:

---

[4] The 1999 RFP does not expressly use the term "performance-based ACC," nor, as far as the Court can determine, does any HUD document related to this protest adopt the abbreviation "PBACC" in reference to these ACCs. However, the 1999 RFP did state that "[f]or work performed under ACCs awarded in response to this RFP, HUD will use Performance-Based Service Contracting (PBSC)," defined as a contracting method that utilizes "measurable, mission-related [goals and] established performance standards and review methods to ensure quality assurance[,] [and which] … assigns incentives to reward performance that exceeds the minimally acceptable and assesses penalties for unsatisfactory performance." AR 430, 64 Fed. Reg. at 27,360. Moreover, later relevant HUD documents refer to the Contract Administrators for these ACCs by the more specific term Performance-Based Contract Administrators ("PBCAs").

As the 1999 RFP clearly demonstrates, and no party contests, since the ACCs in question in this bid protest have been performance-based since the 1999 RFP, the Court will use the term "PBCAAs" throughout the remainder of this opinion.

[5] As HUD noted in the 1999 RFP, the 1937 Housing Act defines a "public housing authority" as a "State, county, municipality, or other governmental entity or public body (or agency or instrumentality thereof) which is authorized to engage in or assist in the development or operation of low-income housing." 42 U.S.C. § 1437a(b)(6)(A); see AR 429, 64 Fed. Reg. at 27,359.

However, the 1999 RFP also expressly provided that this limitation did "not preclude joint ventures or other partnerships between a PHA and other public or private entities to carry out the PHA's contract administration responsibilities under the ACC between the PHA and HUD." Id.

[t]he major tasks of the Contract Administrator under the ACC and this RFP include, but are not limited to:

- Monitor[ing] project owners' compliance with their obligation to provide decent, safe, and sanitary housing to assisted residents.

- Pay[ing] property owners accurately and timely.

- Submit required documents accurately and timely to HUD (or a HUD designated agent).

- Comply with HUD regulations and requirements, both current and as amended in the future, governing administration of Section 8 HAP contracts.

AR 429, 64 Fed. Reg. at 27,359.

Finally, although the 1999 RFP did not mention "staff downsizing," it stated that "[u]nder the approximately 20,000 Section 8 HAP Contracts this RFP covers, HUD pays billions of dollars annually to owners on behalf of eligible property residents. HUD seeks to improve its performance of the management and operations of this function through this RFP." Id. 428, 64 Fed. Reg. at 27,358. The RFP was silent regarding any statutory amendments or directives mandating that HUD issue the RFP or use ACCs to shift its HAP contract administration duties to PHAs.

As a result of the 1999 RFP, HUD ultimately awarded 37 PBACCs. AR 271. Between 2001 and 2003, HUD then awarded seven more PBACCs under a separate, substantially equivalent, RFP. Finally, between 2003 and 2005, it awarded nine additional PBACCs under a related invitation for the submission of applications.[6] Id. At some point not clearly established in the record, HUD received approval to extend the contracts for an additional ten years. Id. 272.

## B. The 2011 Invitation for Submission of Applications

On February 25, 2011, HUD issued an "Invitation for Submission of Applications: Contract Administrators for Project-Based Section 8 Housing Assistance Payments Contracts" ("2011 Invitation" or "Invitation"). AR 522-43. The Invitation was for the purpose of receiving new applications from PHAs to administer the Project-Based Section 8 Housing Assistance Payments Contracts as Performance-Based Contract

---

[6] The 1999 RFP, as well as the 2011 and 2012 notices discussed below, covered 53 "states" – the 50 states of this country, plus the District of Columbia, Puerto Rico, and the Virgin Islands.

Administrators ("PBCAs").  As relevant to this bid protest, the terms of the 2011 Invitation largely tracked those of the 1999 RFP.

After HUD awarded PBACCs under the 2011 Invitation for each of the covered jurisdictions, some of the disappointed PHAs filed protests at the Government Accountability Office ("GAO"), contesting the award of 42 PBACCs. AR 2843 (GAO Decision).  The protests generally alleged that the PBACCs were procurement contracts and not properly awarded in accordance with federal procurement law, that out-of-state PHAs were not legally qualified to administer the Section 8 program within a given state, and that HUD's evaluation of the applications was flawed.  Immediately thereafter, HUD began receiving a deluge of correspondence from various State Attorney Generals, offering opinions on whether their respective state law permits an out-of-state PHA to operate lawfully within its jurisdiction.  In every case, the Attorney General opined that his or her state's law did not permit such operation.[7]

On August 10, 2011, HUD awarded PBACCs for the 11 "states" for which it had received only one application from a qualified PBCA.  AR 220.  These ACCs remain in effect today, and are not involved in this litigation.  On the same date, HUD announced that it would not, at that time, award PBACCs in the remaining 42 jurisdictions, but would instead evaluate and revise its award process for these contracts.  Id. 2843. Accordingly, GAO dismissed the protests to allow HUD to take corrective action.  Id.

## C. The 2012 Notice of Funding Availability

On March 9, 2012, HUD issued a "Fiscal Year (FY) 2012 Notice of Funding Availability (NOFA) for the Performance-Based Contract Administrator (PBCA) Program for the Administration of Project-Based Section 8 Housing Assistance Payments Contracts" ("2012 NOFA"), the document that is the subject of this litigation.  AR 551-89.  The terms of the 2012 NOFA differ in four material ways from the 1999 RFP and 2011 Invitation.  First, the 2012 NOFA expressly invokes subsection (b)(1) as it authority for awarding the ACCs, stating, "[t]he PBCA program … effectuates the authority explicitly provided under section 8(b)(1) of the 1937 Act for HUD to enter into an ACC with a PHA [as defined by the Act]."  AR 552.  Second, the NOFA expressly states that the "ACCs HUD seeks to award are cooperative agreements," and that:

> a principal purpose of the ACC between HUD and the PHA is to transfer funds (project-based Section 8 subsidy and performance-based contract administrator fees, as appropriated by Congress) to enable PHAs to carry

---

[7] Links to these various state attorney general opinions transmitted to HUD can be found at: http://portal.hud.gov/hudportal/HUD?src=/program_offices/housing/mfh/PBCA%20NOFA (last visited April 17, 2013).

out the public purposes of supporting affordable housing as authorized by sections 2(a) and 8(b)(1) of the 1937 Act.

Id. 557.

Third, the NOFA establishes a preference for in-state applicants, stating that although "HUD believes that nothing in the 1937 Act prohibits" a PHA "from acting as a PHA in a foreign State:"

> HUD will consider applications from out-of-state applicants *only* for States for which HUD does not receive an application from a legally qualified in-State applicant. Receipt by HUD of an application from a legally qualified in-State applicant will result in the rejection of any applications HUD receives from an out-of-State applicant for that state.

Id. at 554 (emphasis added).[8] Finally, in the Question and Answer section of the NOFA, the NOFA effectively creates an additional preference for a particular type of PHA – namely, a state Housing Finance Authority ("HFA"). In this section, HUD confirms that where the Attorney General of a given state submits a letter to HUD concluding that under that state's law, the state HFA alone possesses statewide jurisdiction as a PHA, HUD will award the ACC for the state to the HFA. AR 617, 618, 622 (NOFA Q&As 163, 170, 191).

### D. 2012 GAO Protest

In May 2012, prior to the due date for the submission of applications under the 2012 NOFA, seven protesters[9] filed bid protests at the GAO, making substantially similar arguments as they make here – namely that the NOFA's preference for in-State PHAs, as well as its effective preference for state HFAs in particular, violated the terms of the Competition in Contracting Act, 41 U.S.C § 3301, ("CICA") as well as the terms of the Federal Acquisition Regulation ("FAR").

On August 15, 2012, the GAO issued a decision sustaining the protests. AR 2838-52. The GAO decision did not consider the complex statutory history outlined above, but instead focused on (1) the stand-alone terms of the 1999 RFP, 2011 Invitation, and 2012 NOFA, and (2) the standards distinguishing procurement contracts, grants, and cooperative agreements under the FGCAA, 31 U.S.C. §§ 6301-6308.

---

[8] The NOFA further provides that, if no qualified applicant applies "for any jurisdiction, HUD will administer the HAP contracts for that state internally, in accordance with past practice and the United States Housing Act of 1937." AR 608.

[9] The GAO protesters included all of the Plaintiffs here, with the exception of California Affordable Housing Initiatives, Inc., which has protested the 2012 NOFA solely in this venue.

Summarizing the FGCAA standards, the GAO stated that HUD could properly characterize the ACCs at issue as cooperative agreements only if "the principal purpose of the[se] agreement[s] is to provide assistance to the recipient [*i.e.*, the PHA] to accomplish a public objective authorized by law." AR 2847. "In contrast, if the federal agency's principal purpose is to acquire goods or services for the direct benefit or use of the federal government, then a procurement contract must be used." Id. In particular, the GAO further opined that "if the agency otherwise would have to use its own staff to provide the services offered by the intermediary to the beneficiaries, then a procurement contract is the proper instrument." Id.

Applying these criteria, the GAO concluded that the purpose of the ACCs in question was not to "assist" PHAs because, *inter alia*, the PHAs served as mere "conduits" for the HAP payments from HUD to property owners, and certain statements made by HUD in advance of the 1999 RFP indicated that HUD saw its principal purpose in awarding the ACCs as facilitating a staff reduction. AR 2850-51.

HUD decided to disregard the GAO decision and proceed with the NOFA. The Plaintiffs then filed their respective actions challenging HUD's determination in this Court, again alleging that the ACCs in question are procurement contracts, and that the NOFA's preference for in-State PHAs, and for the statewide HFAs in particular, violated CICA and the FAR. On December 13, 2012, the Court consolidated the judicial actions and established a briefing schedule on the cross-motions regarding subject matter jurisdiction and for judgment on the administrative record. On February 19, 2013, the Court heard oral argument on the parties' respective motions.

The Plaintiffs in this case are as follows, and will be referred to by the abbreviations herein: CMS Contract Management Services and the Housing Authority of the City of Bremerton (collectively, "CMS"); Assisted Housing Services Corp., North Tampa Housing Development Corp., and California Affordable Housing Initiatives, Inc. (collectively, "AHSC"); Southwest Housing Compliance Corporation ("SHCC"); Navigate Affordable Housing Partners ("NAHP"); National Housing Compliance ("NHC"); and Intervenor Plaintiff Massachusetts Housing Finance Agency ("MHFA"). All Plaintiffs are PHAs within the meaning of the 1937 Housing Act. In addition, the Court permitted the *amicus* participation of the National Council of State Housing Authorities ("NCSHA").

Analysis

HUD does not dispute that the 2012 NOFA fails to comply with CICA and the FAR, AR 1151, but instead argues that these statutory and regulatory requirements have no applicability to its actions here, as the contracts to be awarded under the NOFA are cooperative agreements, not procurement contracts. Accordingly, the Government has

16

moved, pursuant to Rule of the Court of Federal Claims ("RCFC") 12(b)(1), to dismiss all of the Plaintiffs' challenges to the propriety of the 2012 NOFA for lack of subject matter jurisdiction. In the alternative, the Government moves pursuant to RCFC 52.1(c) for judgment on the administrative record. The Plaintiffs have opposed these motions and cross-moved under RCFC 52.1(c) for judgment on the administrative record. However, the Plaintiffs have, for the most part, made these motions separately, and offered somewhat divergent arguments supporting their respective positions.

The Court will address the Government's motion to dismiss for lack of subject matter jurisdiction, and the parties' cross-motions for judgment on the administrative record, in turn below.

I.      Subject Matter Jurisdiction

A defendant may raise either a facial or a factual challenge to a plaintiff's assertion that a court possesses subject matter jurisdiction over its claims. See Cedars-Sinai Med. Ctr. V. Watkins, 11 F.3d 1573, 1584 (Fed. Cir. 1993). In a facial challenge, where a defendant challenges the sufficiency of the facts alleged in the complaint to establish jurisdiction, the Court must accept the plaintiff's well-pleaded factual allegations as true, and draw all reasonable inferences in the plaintiff's favor. Id. at 1583 (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). However, where, as here, "the Rule 12(b)(1) motion denies or controverts the pleader's allegations of jurisdiction … the allegations in the complaint are not controlling, and only uncontroverted factual allegations are accepted as true for purposes of the motion." Id. (internal citations omitted); Shoshone Indian Tribe of Wind River Reservation v. United States, 672 F.3d 1021, 1030 (Fed. Cir. 2012). In such a case, "[i]n resolving [any] disputed predicate jurisdiction facts, 'a court is not restricted to the face of the pleadings, but may review evidence extrinsic to the pleadings.'" Shoshone Indian Tribe, 672 F.3d at 1030 (quoting Cedars-Sinai Med. Ctr., 11 F.3d at 1584). In addition, it is the plaintiff's burden to establish any challenged jurisdictional facts by a preponderance of the evidence. Sci. Applications Int'l Corp. v. United States, 102 Fed. Cl. 644, 651 (Fed. Cl. 2011).

The Plaintiffs assert jurisdiction under the Tucker Act, which grants this Court jurisdiction to render judgment on "an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). The Tucker Act does not itself define "procurement," Resource Conservation Group, LLC v. United States, 597 F.3d 1238, 1244 (Fed. Cir. 2010). However, in determining the scope of § 1491(b)(1), the Federal Circuit has adopted the definition of "procurement" contained in 41 U.S.C. § 403(2), which has been reorganized into 41 U.S.C. § 111. Distributed Solutions, Inc. v. United States, 539 F.3d 1340, 1345 (Fed. Cir. 2008). Section 111, in turn, provides that the term "'procurement' includes all stages

17

of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with a contract completion and closeout."

The Government opposes the Plaintiffs' assertions of jurisdiction, arguing that this Court lacks the authority to adjudicate this case on the merits "because HUD's award of a cooperative agreement in the form of [an] ACC is not a 'procurement' within the meaning of the Tucker Act." HUD Mem. at 21. However, although the parties jointly conceptualize the jurisdictional question in this case to be whether the PBACCs awarded by HUD under the 2012 NOFA are "procurement contracts" within the meaning of section 1491(b)(1) (or rather cooperative agreements), the Court finds that this issue is properly considered on the merits.

That is, the Court finds under the Tucker Act, it has jurisdiction to review a party's contention that a particular government contact is a procurement contract and therefore subject to CICA. See 360Training.com, Inc. v. United States, 104 Fed. Cl. 575, 588 (2012) (holding that "the definition of 'procurement' under the Tucker Act is broader than the definition of 'procurement contract' in the FGCAA," such that "an agency can engage in a procurement process [for the purposes of the Tucker Act] even though it is using a cooperative agreement, instead of a procurement contract, to memorialize the parties' agreement"). Because the Plaintiffs have raised exactly such a claim, jurisdiction is proper, and the Court will analyze the question of whether the PBACCs are procurement contracts or cooperative agreements on the merits.

II.   Cross-Motions for Judgment on the Administrative Record

A.   Standard of Review

In a bid protest, a court reviews an agency's procurement-related actions under the standards set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, which provides that a reviewing court shall set aside the agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," id.; see also, e.g., Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1350-51 (Fed. Cir. 2004) (internal citation omitted). Under this standard, "[a] bid protest proceeds in two steps." Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005). First, the Court determines whether a procurement-related decision either (a) lacked a rational basis, or (b) involved a violation of a statute or regulation. Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1381 (Fed. Cir. 2009). "A court evaluating a challenge on the first ground must determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion. When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations." Id. (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332–33 (Fed. Cir. 2001)).

The inquiry at this first step is "highly deferential," Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000), and *de minimis* errors in a procurement-related process do not justify relief, Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 1000 (Fed. Cir. 1996) (citing Andersen Consulting v. United States, 959 F.2d 929, 932–33, 935 (Fed. Cir. 1992)). If the Court finds that the agency acted without a rational basis or contrary to law, it must then, at the second step, "determine… if the bid protester was prejudiced by that conduct." Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005). "Prejudice is a question of fact," which the plaintiff again bears the burden of establishing. Id. at 1353, 1358.

Moreover, in reviewing a motion for judgment on the administrative record made pursuant to RCFC 52.1(c), the court determines "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." Afghan Am. Army Servs. Corp. v. United States, 90 Fed. Cl. 341, 355 (Fed. Cl. 2009). The existence of a material issue of fact, however, does not prohibit the Court from granting a motion for judgment on the administrative record, nor is the court required to conduct an evidentiary proceeding. Id. ("In a manner 'akin to an expedited trial on the paper record,' the court will make findings of fact where necessary.") (quoting CHE Consulting, Inc. v. United States, 78 Fed. Cl. 380, 387 (Fed. Cl. 2007)). Thus, as relevant to this case, in order to prevail on the merits, Plaintiffs must demonstrate, by a preponderance of the evidence, (1) that the terms of the NOFA were unlawful, and (2) that such terms caused them to suffer "a non-trivial competitive injury which can be addressed by judicial relief." Weeks Marine v. United States, 575 F.3d 1352, 1362 (Fed. Cir. 2009).

B. Discussion

As presented, HUD's argument on the merits is that if the NOFA is a procurement and therefore subject to CICA, the agency's decision to forego a CICA-compliant process is nonetheless lawful under the CICA exception that applies where there exist alternate "procurement procedures … expressly authorized by statute." HUD Mem. at 39 (citing 41 U.S.C. § 3301(a)). For their part, the Plaintiffs argue variously that HUD may not invoke this exception because the agency did not certify its applicability as required under the relevant regulations, see CMS Mem. at 36 (citing 48 C.F.R. §§ 6.301-1; 6.304); that HUD's characterization of the PBACCs as cooperative agreements violates the FGCAA, see NAHP Mem. at 35; and that the NOFA – and in particular, its in-state preference – violates CICA's mandate of "full and open completion" in government contracting, see id. at 42 (citing 41 U.S.C. § 3301).

For the reasons explained below, however, the Court finds that it need not resolve many of these questions in order to dispose of this case. Having found jurisdiction to determine whether the PBACCs are procurement contracts or cooperative agreements,

the Court must now proceed to analyze this question on the merits. If, following such an analysis, the Court finds that the PBACCs are procurement contracts, CICA would apply, and further related analysis would become necessary. However, because the Court does not reach this conclusion, but instead finds that HUD has properly classified the PBACCs as cooperative agreements, it need not reach any CICA-related issues raised by the parties.

Accordingly, the Court will explain why, after examining the Housing Act of 1937, as amended, and in light of the standards set forth in the FGCAA, it has determined that the PBACCs are best classified as cooperative agreements rather than procurement contracts.

### 1. FGCAA Standards

The Federal Grant and Cooperative Agreement Act of 1977, or FGCAA, "provides guidance to executive agencies in determining which legal instrument to use when forming a [contractual] relationship" between the agency and another party. 360Training.com, 104 Fed. Cl. at 579; 31 U.S.C. §§ 6301-6308. The FGCAA establishes what is sometimes referred to as the "principal purpose" test, providing that "[a]n executive agency shall use a procurement contract as the legal instrument reflecting a relationship between the United States Government" and a recipient when "the principal purpose of the instrument is to acquire (by purchase, lease, or barter) property or services *for the direct benefit of the United States Government*[.]" 31 U.S.C. § 6303 (emphasis added). Conversely, the FGCAA counsels that "[a]n executive agency shall use a cooperative agreement … when (1) "the principal purpose of the relationship is to *transfer a thing of value*" to the recipient in order "*to carry out a public purpose of support or stimulation authorized by a law* of the United States," and (2) "*substantial involvement* is expected between the executive agency and the State, local government, or other recipient when carrying out the activity contemplated in the agreement." Id. § 6305 (emphasis added).

The FGCAA standards are expressed in mandatory, not precatory, terms. Nonetheless, as HUD and at least some of the Plaintiffs recognize, these standards do not provide hard-and-fast, one-size-fits-all rules. Rather, because every agency has inherent authority to enter into procurement contracts, but must be specifically authorized by statute to enter into assistance agreements, the FGCAA standards must be applied within the context of the agency's specific statutory mandate in entering into the contractual relationship in question. U.S. Government Accountability Office, Principles of Federal Appropriations Law, Vol. II, p. 10-17 (2006) ("GAO Redbook") ("[T]he relevant legislation must be studied to determine whether an assistance relationship is authorized at all, and if so, under what circumstances and conditions."); see also HUD Mem. at 26 ("Although Congress enacted the FGCAA … to establish criteria for Federal agency use of grants, cooperative agreements, and procurement

contracts, the decision as to which legal instrument is appropriate depends, in the initial analysis, on the agency's statutory authority."); NHC Mem. at 39 ("There are two steps involved in conducting an FGCAA analysis, and we do not disagree that the first step in determining the correct funding instrument" is to examine "'whether the agency has statutory authority to engage in assistance transactions at all'") (quoting GAO Redbook at 10-17"); AHSC Mem. at 37 (similar).

In order to determine whether the PBACCs are procurement contracts or cooperative agreements, the Court will therefore begin with a close examination of the "precise statutory obligations" underlying these contracts,[10] as contained in the 1937 Housing Act, as amended. 360Training.com, 104 Fed. Cl. at 579. Once the nature of these obligations has been determined, the Court will then examine them in light of the standards delineated by the FGCAA. See GAO Redbook at 10-17 ("[D]eterminations of whether an agency has authority to enter into [cooperative agreements] in the first instance must be based on the agency's authorizing or program legislation. Once the necessary underlying authority is found, the legal instrument … that fits the arrangement as contemplated must be used, using the [FGCAA] definitions for guidance as to which instrument is appropriate.").

## 2. The PBACCs are Cooperative Agreements

HUD essentially offers two theories of its case. The first of these is based primarily on subsection 8(b)(1) and the second, on subsection 8(b)(2). The Court will address each of these arguments in turn below.

- ### Subsection 8(b)(1) Does Not Govern the ACCs for the New Construction and Substantial Rehabilitation Projects

HUD readily concedes that, pursuant to subsection (b)(2), it was the party that originally entered into, and was responsible for contract administration of, the HAP contracts in question. HUD Reply at 9. However, HUD argues that taken together, HURRA's repeal of Subsection 8(b)(2) and MAHRA's enactment of renewal authority for expiring project-based HAP contracts create a result where the renewal contracts (of which the HAPs at issue here are a subset) are necessarily "'*new*' contracts for *existing* projects," and hence governed by HUD's authority under Section 8(b)(1) of the Housing Act. HUD Reply at 7. Again, Subsection (b)(1) instructs HUD to enter into ACCs with

---

[10] Plaintiff NHC attempts to make much of the fact that the PBACCs were awarded, and have always been treated, as contracts with HUD. NHC Mem. at 17-18. However, as HUD correctly points out, this fact is of no moment, because "[a] grant agreement is an enforceable contract in this court." HUD Reply at 25 (quoting Knight v. United States, 52 Fed. Cl. 243, 251 (2002), *rev'd on other grounds*, 65 F. App'x 286 (Fed. Cir. 2003)). Thus, the relevant issue here is not whether the PBACCs are "contracts," but rather what *type* of contractual relationship they represent with the Government. The Court will therefore sometimes refer to the PBACCs as "contracts," but this term is without legal significance in its analysis.

PHAs, which in turn enter into HAP contracts to provide assistance payments to owners. Under this provision, *only* when no qualified local PHA exists for a given jurisdiction is HUD permitted to enter into a HAP contract directly with a project owner. Moreover, all parties agree that "traditional" ACCs under subsection (b)(1) are properly considered assistance agreements, not procurement contracts. See, e.g., CMS Reply at 2; AHSC Mem. at 35. Thus, the import of this argument is that, in HUD's words, "[i]f the Renewal contracts are new contracts under Section 8 of the 1937 Act, that Section 8 authority can only come from Section 8(b)(1), and as such, HAP contract administration lies only with a PHA." HUD Reply at 12. And, if HAP contract administration lies with the PHAs (as opposed to HUD), then under the FGCAA standards HUD is not "outsourcing" these tasks for its own benefit, and the PBACCs therefore are not procurement contracts.

HUD's argument here proceeds in two steps. First, HUD maintains that "[a]fter [HURRA's] repeal of Section 8(b)(2) in 1983, [HUD's] statutory authority to enter into new rental assistance agreements survived only in Section 8(b)(1) of the Housing Act." Id. at 7. Second, HUD argues that when MAHRA gave the agency authority to renew the expiring (b)(2) contracts, it effectively mandated that such renewals be made pursuant to subsection (b)(1), as "new" contracts for "existing" housing. Id. Although these arguments are ultimately very closely linked, the Court will address them separately and in turn below. As the Court will explain, it finds that this argument is fatally flawed by several strained constructions of the relevant statutory language.

- ## HURRA

In 1983 Congress in HURRA repealed HUD's ongoing authority under Subsection 8(b)(2) to support privately owned new or substantially rehabilitated housing projects pursuant to either a HAP contract with the owner, or an ACC with a PHA (which in turn would enter into a HAP with the owner). However, HURRA also enacted a savings clause, which provides in relevant part that "the provisions repealed shall remain in effect … with respect to any funds obligated for a viable project under section 8 of the United States Housing Act of 1937 prior to January 1, 1984[.]" HURRA § 209(b). HUD contends that "[p]rior to January 1, 1984, no funds were obligated for a project beyond the term of the original HAP contract," and that therefore the savings clause carried legal force with respect to a particular HAP contract only for the length of the original term of that contract. HUD Supp. Mem. at 1 n.1.

Plaintiffs, on the other hand, argue that HUD has identified no statute that ever fully repealed subsection (b)(2) – and, more importantly, that the subsequent statutory history of the Housing Act indicates that Congress has repeatedly and expressly "grandfathered" HUD's expired (b)(2) authority through many statutory revisions. The first relevant amendment that Plaintiffs point to is the Community Housing and Development Act of 1992, Pub. L. No. 102-550, 106 Stat. 3672 (1992) (the "1992 Act" or "1992 Housing Act"). Although the 1992 Act implemented many reforms, its

22

relevance to this case lies in its addition of a single definition to the 1937 Act – to wit, that of "project-based assistance." The 1992 Act defined this term as "rental assistance under section (b) of this section [*i.e.*, Section 8] that is attached to the structure pursuant to subsection (d)(2) … ." Id. § 146, codified at 42 U.S.C. § 1437f(f)(6).[11] Subsection (d)(2), also an addition of the 1992 Act, states, in turn:

> In determining the amount of assistance provided under [either (i)] an assistance contract for project-based assistance under this paragraph or [(ii)] *a contract for assistance for housing constructed or substantially rehabilitated pursuant to assistance provided under subsection (b)(2) of this section (as such subsection existed immediately before October 1, 1983),* the Secretary may consider and annually adjust, with respect to such project, [for the cost of service coordinators for residents who are elderly or disabled].

Id. § 674, currently codified at 42 U.S.C. § 1437f(d)(2)(B)(i) (emphasis added).

HUD denies that these provisions are evidence of its authority under subsection (b)(2) continuing to be grandfathered into the 1937 Housing Act. In making this argument, it emphasizes the first portion of the definition added by section 146 of the 1992 Act: *i.e.*, that "project-based assistance" is "rental assistance *under subsection [8](b)*" (emphasis added). In HUD's interpretation, because by 1992 the agency's "statutory authority to enter into new rental assistance agreements survived only in [subs]ection 8(b)(1) of the Housing Act," HUD Reply at 7, the new definition of "project-based housing" did nothing more than make "explicit" the fact that, post-HURRA, "HUD's authority to enter into ACCs with PHAs for existing housing under [subs]ection 8(b)(1) … remained intact, for *both* project-based and tenant-based programs." HUD Mem. at 11 (emphasis added). In other words, according to HUD, by defining "project-based assistance" as "rental assistance under section [8](b)," section 146 of the 1992 Act simply confirmed that, notwithstanding the repeal of subsection (b)(2), HUD's remaining (b)(1) authority encompassed the authority to enter into "new" rental assistance agreements for (existing) project-based housing.[12]

---

[11] In full, 42 U.S.C. § 1437f(f)(6) currently defines "project-based assistance" as "rental assistance under section (b) of this section that is attached to the structure pursuant to subsection (d)(2) *or (o)(13)* of this section." (emphasis added). Subsection (o)(13) applies only to the tenant-based Section 8 program, and provides that a PHA may, subject to certain conditions, divert up to 20 percent of the funding the PHA receives from HUD for its tenant-based program to fund project-based tenant subsidies attached to existing, newly constructed, or rehabilitated housing. As subsection (o)(13) is not relevant here, the Court will exclude it from its analysis.

[12] HUD's only substantive attempt to deal with the entirety of subsection (d)(2) is an argument that "[t]he fact that subsection (d)(2) identifies several categories or projects, including 'existing housing' and new construction and substantially rehabilitated projects, is immaterial; they are all included within the scope of subsection (d)(2)." HUD Reply at 12 n.9. If there is any logic in or point to this statement, the Court fails to perceive it.

Some of the Plaintiffs, however, read these clauses very differently. Plaintiff AHSC summarizes the alternative reading of these amendments most succinctly, as follows:

> [Through subsection (d)(2),] Congress acknowledged that there were project-based programs not only 'under this paragraph,' *i.e.*[,] under the surviving (b)(1), but *also* under contracts 'for assistance for housing constructed or substantially rehabilitated pursuant to assistance provided under subsection (b)(2) of this section (as such subsection existed immediately before October 1, 1983).' In other words[,] Congress specifically recognized that the projects for new construction and substantial rehabilitation entered into before [the close of] 1983 continued to exist[, albeit] in a special category. They were not within Section 8(b)(1), and, therefore, not subject to [the] provisions for [the preferred] use of PHAs [established by Section] 8(b)(1)[.]

AHSC Mem. at 44-45; NHC Mem. at 5-6.

The Court agrees with the Plaintiffs on this point. By making express reference to housing funded under the expired subsection (b)(2) and including it within its definition of "project-based assistance," the 1992 Act "confirmed" nothing more than that HUD's authority under this provision continued to be grandfathered into the 1937 Act, its repeal notwithstanding.

Moreover, other more recently enacted statutes confirm this reading. MAHRA, for example, defines "project-based assistance" as "rental assistance described in paragraph (2)(B) of this section that is attached to a multifamily housing project." MAHRA § 512(11). Paragraph (2)(B) of section 512, in turn, defines "eligible multifamily housing projects" as inclusive of, *inter alia*, properties "that [are] covered in whole or in part by a contract for project-based assistance under … the new construction or substantial rehabilitation program under section (b)(2) of the United States Housing Act of 1937 (as in effect before October 1, 1983)." Id. § 512(2)(B)(i); see also 24 C.F.R. § 402.2 (MAHRA regulations, providing that "[p]roject-based assistance means the types of assistance listed in section 512(2)(B) of MAHRA, or a project-based assistance contract under the Section 8 program renewed under section 524 of MAHRA."). Similarly, a year later QHWRA defined "project-based assistance" as including, *inter alia*, "the new construction and substantial rehabilitation program under section 8(b)(2) (as in effect before October 1, 1983)." Pub. L. No. 105-276 § 513, 112 Stat. 2461, 2546.

Thus, HUD's interpretation of HURRA's savings clause is strongly belied by the subsequent statutory history of the Housing Act, in which Congress repeatedly

24

recognized the continued existence and viability of "(b)(2)" projects entered into before the close of 1983.

- ## MAHRA

The second prong of HUD's "(b)(1)" argument is that when MAHRA gave the agency authority to renew the expiring (b)(2) contracts, it effectively mandated that such renewals be made pursuant to subsection (b)(1).

Again, MAHRA was enacted in 1997 in order to, *inter alia*, provide a permanent and generalized mechanism by which HUD could renew expiring project-based HAP contracts – which, when originally authorized, carried terms of 20 to 40 years. Pub. L. No. 105-65, Title V, § 524, 111 Stat. 1384, 1408 (1997), 42 U.S.C. § 1437f note (Supp. III 1997). As relevant to this case, section 524(a)(1) of MAHRA, entitled "Section 8 Contract Renewal Authority," provided that:

> [HUD's] Secretary may use amounts available for the renewal of assistance under section 8 of the United States Housing Act of 1937, upon termination or expiration of a contract for assistance under section 8 (other than a contract for tenant-based assistance …) to provide assistance under section 8 of such Act at rent levels that do not exceed comparable market rents for the market area. The assistance shall be provided in accordance with terms and conditions prescribed by the Secretary.

Id. In 1999, Congress replaced this language with a provision stating that:

> [HUD's] Secretary shall, at the request of the owner of the project and to the extent sufficient amounts are made available in appropriation Acts, use amounts available for the renewal of assistance under section 8 of such Act to provide such assistance for the project. The assistance shall be provided under a contract having such terms and conditions as the Secretary considers appropriate, subject to the requirements of this section.

Pub. L. No. 106-74, Title IV, Subtitle C, § 531, 113 Stat. 1047, 1109-10, 42 U.S.C. § 1437f note (2006).

At this step of its argument, HUD points out that by the time, pursuant to section 524 of MAHRA, that it renewed its assistance for the projects it had initiated under subsection 8(b)(2), such projects had "been in existence for more than twenty years[.]" HUD Reply at 11-12. According to HUD, "common sense" therefore counsels that these projects consisted of "'existing dwelling units,' as that phrase is used in [subs]ection 8(b)(1)." Id. In addition, HUD points to two definitional provisions of MAHRA, as well as a clause in the HAP renewal contracts. Specifically, HUD points out that under

25

MAHRA, (i) "[r]enewal" is defined as 'the *replacement* of an *expiring ... contract* with a *new* contract under Section 8 of the [1937 Act]…," and (ii) that an "expiring contract," in turn, is defined as "a project-based assistance contract that, by its terms, *will expire*." 42 U.S.C. § 1437f note (MAHRA § 512(12), (3), respectively) (emphasis added); see HUD Reply at 11.  Additionally, the post-MAHRA renewal contracts themselves contain the following clause:

> Previously, the Contract Administrator and the Owner had entered into a HAP Contract ("expiring contract") to make Section 8 housing assistance payments to the Owner for eligible families living in the Project.  The term of the expiring contract will end prior to the beginning of the term of the Renewal Contract.

AR 2270-71 (Renewal Contract).  On the basis of these provisions, HUD contends that MAHRA thus "provide[d] for the expiring contracts *actually to expire* before new renewal contracts take effect." HUD Reply at 11.  (emphasis added).

However, as the Plaintiffs point out, the renewal contracts also state that the "[t]he purpose of the Renewal Contract is to *renew the expiring contract for an additional term*," AR 2271 (emphasis added).  And, an attachment to these contracts further provides that "[t]he Renewal Contract *must be entered [into] before expiration of the Expiring Contract*."  AR 2282 (emphasis added).  That is, MAHRA does not define "expiring contract" as a contract that has expired; rather, it states that such a contract is one that will, at some point in the future, reach the end of its term.  Pursuant to the terms of the renewal contracts themselves, all such contracts were expressly required to be executed *prior* to the expiration of the contracts they replaced.  Moreover, as Plaintiffs note, "[n]owhere in MAHRA does Congress say that the expiring Section (b)(2) HAP contracts will be replaced with new contracts under Section (b)(1)."  SHCC Reply at 5.  To the contrary, as discussed above, MAHRA expressly includes properties "that [are] covered in whole or in part by a contract for project-based assistance under … the new construction or substantial rehabilitation program under section (b)(2) of the United States Housing Act of 1937 (as in effect before October 1, 1983)"  as among those eligible for renewal assistance under its terms.  MAHRA § 512(2)(B)(i).

Thus, while HUD is correct that the renewal contracts were "new" contracts (as, indeed they could only have been, having come into existence only upon their execution), it simply does not follow from this fact that these contracts were somehow executed pursuant to subsection 8(b)(1), notwithstanding their origin under subsection 8(b)(2).  The Court therefore agrees with the Plaintiffs that the renewal contracts, true to their titles, simply renewed the assistance that "(b)(2)" projects had been receiving since their inception, and did so under the same subsection (if not necessarily under the exact same terms) as that under which such projects were originally authorized.  That is, the Court finds that notwithstanding its repeal, subsection 8(b)(2) continues to govern the various

26

contracts for the housing projects that were originally authorized and supported pursuant to the subsection's terms.

This conclusion does not, however, end the Court's analysis. Rather, the question now becomes whether, under the expired but grandfathered subsection 8(b)(2), HUD is given the authority or discretion to use cooperative agreements in providing the renewal assistance in question. The Court will now turn to that issue.

- Section 8(b)(2) Authorizes HUD to Use Cooperative Agreements with PHAs to Provide Assistance to the New Construction and Substantial Rehabilitation Projects.

Again, the full text of Subsection 8(b)(2) of the Housing Act reads:

To the extent of annual contributions authorizations under section 5(c) of this Act, the Secretary is authorized to make assistance payments pursuant to contracts with owners or prospective owners who agree to construct or substantially rehabilitate housing in which some or all of the units shall be available for occupancy by lower-income families in accordance with the provisions of this section. The Secretary may also enter into annual contributions contracts with public housing agencies pursuant to which such agencies may enter into contracts to make assistance payments to owners or prospective owners.

88 Stat. 662-63.

The first sentence of subsection (b)(2) permitted HUD to subsidize low-income housing by entering into HAP contracts directly with owners or prospective owners of multifamily housing. Alternatively, the second sentence of this provision, which is effectively identical to the authority conveyed by subsection 8(b)(1), allowed HUD, at its option, to enter into ACCs with PHAs, which, in turn, enter into HAP contracts with owners. Compare id. with 42 U.S.C. § 1437f(b)(1) ("The Secretary is authorized to enter into annual contributions contracts with public housing agencies pursuant to which such agencies may enter into contracts to make assistance payments to owners …").

HUD's "(b)(2)" argument is that even if the HAP contracts at issue remain subject to subsection 8(b)(2), nothing in that provision *requires* HUD to directly administer the renewal of HAP contracts. HUD readily concedes that it provided support to the vast majority of the housing projects now at issue pursuant to sentence one of this subsection, and thus that, as the Plaintiffs emphasize, "[t]he [PBACCs that] were awarded under the 1999 RFP were for contract administration services that had previously been performed by HUD itself." NHC Mem. at 17. Nonetheless, HUD argues that because it:

27

is not, and has never been, *obligated* [under subsection 8(b)(2)] to act as the contract administrator for the projects at issue, contract administration services [for the relevant HAP contracts] are not, and cannot reasonably be construed as being, for HUD's benefit.… A cooperative agreement is the appropriate instrument [through which] to implement the second sentence of [subs]ection 8(b)(2).

HUD Supp. Mem. at 5-6 (emphasis added).

In other words, HUD's "(b)(2)" argument is that, having initiated support for certain projects under sentence one of this subsection, nothing in the relevant statutes or regulations required that, when the agency renewed such assistance, it continue to do so under the "sentence one" model, wherein HUD enters into a HAP contract directly with the owner, without the intermediation of a PHA. The import of this argument is that, as HUD admits, "if the statute mandates that HUD enter into the HAP contract, then HUD has the obligation to administer the contract." HUD Reply at 9 n.7. Under the standards set forth by the FGCAA, HUD further concedes that in such circumstances, the PBACCs would be for HUD's benefit, and thus properly classified as procurement contracts. However, HUD maintains that because no such mandate exists, it is free to use cooperative agreements to continue its "(b)(2)" assistance, and that the PBACCs at issue in the 2012 NOFA are, in fact, such agreements.

The Plaintiffs disagree, for reasons that are divergent and that, in several cases, have evolved over the course of this litigation. Essentially, however, they contend that if the Court were to determine "the [subsection 8](b)(2) authority currently applies to the newly constructed and substantially rehabilitated housing HAP contracts at issue here, then the Government has responsibility to administer them, and as such, is receiving a direct benefit from the PBCA[']s … [performance of] services that HUD itself is otherwise required to perform." NHC Mem. at 23-24. Their specific arguments in support of this position, broadly speaking, fall into two categories. First, Plaintiffs argue that MAHRA "commands HUD to enter into HAP renewals and, therefore … [gives] HUD … the obligation to administer the contract." CMS Reply at 11. Second, Plaintiffs argue that a variety of regulatory provisions confirm this conclusion. The Court will address each set of issues below.

- ### MAHRA Mandates Only That HUD Provide Assistance.

The Court has twice reproduced substantial portions of both the first and the second versions of MAHRA § 524, above, and will not repeat this text verbatim again here. Briefly, however, the relevant section of the earlier-enacted version of MAHRA stated only that HUD "may" use certain specified funds to provide renewal assistance for, *inter alia*, the expiring "(b)(2)" contracts. 42 U.S.C. § 1437f note; see, e.g., AHSC Mem.

28

at 11n.10 (noting permissive language in first iteration of § 524).[13]  As some Plaintiffs note, however, in 1999 Congress revised this language to state that HUD's "Secretary shall, at the request of the owner … use amounts available for the renewal of assistance under section 8 of such Act to provide such assistance for the project."  Pub. L. No. 106-74, Title IV, Subtitle C, § 531, 42 U.S.C. § 1437f note.   Plaintiffs employ this language to make two primary arguments, both of which prove unavailing.

First, Plaintiffs seize on the mandatory phrasing of section 524 – and in particular, its use of the word "shall" – to argue that pursuant to this provision, "upon request of a project owner, HUD *must renew the HAP contract* using Section 8 funds."  AHSC Reply at 9 (emphasis added).  While superficially appealing, the problem with this argument is that, carefully read, section 524 is simply not so specific.  Rather, Section 524 provides only that the "Secretary shall … *provide ... assistance*" for qualifying projects.  Pub. L. No. 106-74, Title IV, Subtitle C, § 531, 42 U.S.C. § 1437f note (emphasis added).   As explained above, subsection (b)(2) provides *two* mechanisms by which HUD may provide assistance to covered projects, only one of which is directly through a HAP contract between HUD and the owner.  Thus, while Section 524 makes the renewal of assistance mandatory for any owner who so requests it (subject to the availability of funds), it does not, as Plaintiffs claim, specify the mechanism through which HUD must provide the assistance.

Second, Plaintiffs emphasize the responsibility that Section 524 places on the HUD Secretary (as opposed to the PHAs) in initiating the provision of the renewal assistance.  See NAHP Reply at 5 ("MAHRA unequivocally put[] the obligation on 'the Secretary' to extend HAP contracts with owners who request it."); AHSC Reply at 9-10 ("[I]t is noteworthy that this central renewal language provides that it is *the Secretary* who shall renew these contracts.") (emphasis in original).  The Plaintiffs' point appears to be that "[i]f Congress had intended for local housing agencies to renew HUD's HAP Contracts, it would have stated '*local housing authorities* shall renew an expiring contract."  CMS Reply at 8 (emphasis in original).

_____

[13] Plaintiff CMS misleadingly cites to a separate provision of MAHRA, § 524(a)(2), entitled "Exception Projects," which provides that, "notwithstanding [the permissive language in] paragraph (1)," for certain specified categories of multifamily housing (and these categories *only*) HUD was required, "upon request of the owner," to "renew an expiring contract in accordance with the terms and conditions prescribed by the Secretary[.]"  Pub. L. No. 105-65, Title V, § 524(a)(2); see CMS Mem. at 11. While a few of the categories of housing listed in this subsection appear to be programs at issue in this litigation, the list falls far short of including all such programs – a distinction conveniently omitted by CMS.  In any event, as explained above, the Court finds that the latter-enacted version of § 524 is the one relevant here, both because it remains in effect today and because it was enacted prior to the award of the PBCAAs under the 1999 RFP.  See AR 1704.  Accordingly, the Court finds the mandatory language in the 1997 version of § 524(a)(2) wholly irrelevant to this case.

29

Again, the Court finds that this argument falls well short of establishing that HUD cannot, pursuant to the second sentence of subsection (b)(2), use assistance agreements to provide renewal assistance. As a preliminary matter, Section 8 is a federal program (albeit one run largely in cooperation with the states). As such, the Secretary is necessarily involved in its administration, even for those portions of the program which the Plaintiffs concede operate pursuant to cooperative agreements. Second, it is a matter of established fact, contested by no party, that HUD was the original counterparty to, and contract administrator of, the vast majority of projects authorized under subsection 8(b)(2). As the Plaintiffs themselves are at great pains to emphasize, until such time as HUD entered into the PBACCs pursuant to the 1999 RFP, PHAs were simply not involved, in any capacity, in such "HUD / private owner" projects. Against this backdrop, however, Plaintiffs fail to explain how Congress could possibly have effected an intention to provide for more programmatic involvement on the part of the states (and their political subdivisions, the PHAs) by directing that the PHAs "renew" HAP contracts to which they were not a party in the first instance.

- Program Regulations and Other Design Features Confirm That HUD May Use Assistance Agreements to Provide Renewal Assistance.

Finally, Plaintiffs point to various regulations and HUD guidance documents in support of two related, but slightly different arguments. The first of these arguments is that HUD has, at a minimum, a regulatory duty to administer itself the HAP contracts in the NOFA portfolio. Here, Plaintiffs cite two regulations naming HUD as the "Contract Administrator." First, 24 C.F.R. § 880.201 defines a project-based Section 8 "Contract Administrator" as "[t]he entity which enters into the [HAP] Contract with the owner and is responsible for monitoring performance by the owner. The contract administrator is a PHA in the case of private-owner/PHA projects, and HUD in private-owner/HUD and PHA-owner/HUD projects." Second, 24 C.F.R. § 880.505(a) provides:

> Contract administration. For private-owner/PHA projects, the PHA is primarily responsible for administration of the Contract, subject to review and audit by HUD. For private-owner/HUD and PHA-owner/HUD projects, HUD is responsible for administration of the Contract. The PHA or HUD may contract with another entity for the performance of some or all of its contract administration functions.

Taken together, Plaintiffs argue that these regulations establish HUD as the Contract Administrator of the HAP contracts in the 2012 NOFA profile, such that "while … HUD may contract out performance of its contract administration function to another entity, it cannot shed its responsibility to administer contracts for the projects in the NOFA portfolio." AHSC Reply at 5-6.

30

HUD, for its part, counters that under the terms of the PBACCs as well as the Renewal Contracts, the PHAs are clearly designated as the "Contract Administrators" and that, under applicable MAHRA regulations, these contract terms override any contradictory regulations stating that HUD carries this role. Specifically, HUD cites 24 C.F.R. § 402.3 ("Contract provisions"), which provides that "[t]he renewal HAP contract shall be construed and administered in accordance with all statutory requirements, and with all HUD regulations and other requirements, including changes in HUD regulations and other requirements during the term of the renewal HAP contract, *unless the contract provides otherwise*." (emphasis added). In light of this provision, HUD argues that "[b]ecause the Renewal HAP contract explicitly provides that the PHA, not HUD, is the contract administrator, any regulation to the contrary does not apply." HUD Reply at 18.

The Plaintiffs do not contest that the renewal contracts in fact designate the PHA, and not HUD, as the Contract Administrator. However, they counter that this nomenclature is without meaning, because as a matter of general principle the terms of the renewal contract cannot trump those of regulations which HUD has promulgated itself and is bound to follow. SHCC Reply at 9; AHSC Reply at 13; CMS Reply at 15. Thus, according to the Plaintiffs:

> the fact that the PHA is named as the contract administrator on a HAP contract means nothing more than that HUD outsourced its ultimate authority as the contract administrator to the PHA in accordance with applicable statutes and regulations. The PHA's role as a contract administrator on a HAP contract does not relieve HUD of its obligation to administer the HAP contracts and provide project-based housing assistance.

SHCC Reply at 9.

What the Plaintiffs miss, however, is that HUD is *not* arguing in general terms that a contract term can trump a regulation, but rather is pointing to a *specific* regulation expressly stating that the terms of the renewal contracts, in particular, take precedence over any conflicting regulations or other program requirements governing the Section 8 program.[14] See 24 C.F.R. § 402.3. The Court therefore agrees with HUD that the Renewal Contracts' designation of the PHAs as the Contract Administrator is legally meaningful, and overrides the regulations cited by Plaintiffs insofar as they state to the contrary.

Citing 24 C.F.R. § 880.505(c), HUD also contends that this transfer of contract administration duties is legally permissible. That regulation provides:

---

[14] Plaintiff AHSC attempts to argue that the phrase "unless the contract provides otherwise," as it is used in 24 C.F.R. § 402.3, applies only to subsequently enacted regulations and requirements. See AHSC Reply at 14. The Court finds this interpretation to contravene the plain language of the regulation.

31

> Conversion of Projects from one Ownership/Contractual arrangement to another. Any project may be converted from one ownership/contractual arrangement to another (for example, from a private-owner/HUD to a private-owner/PHA project) if:
>
> > (1) The owner, the PHA and HUD agree,
> >
> > (2) HUD determines that conversion would be in the best interest of the project, and
> >
> > (3) In the case of conversion from a private-owner/HUD to a private-owner/PHA project, contract authority is available to cover the PHA fee for administering the Contract.

24 C.F.R. § 880.505(c).

Here, HUD argues that "[b]y executing the Renewal Contracts at issue in the NOFA, the owner, the PHA, and HUD expressly agree that the PHA will act as contract administrator." HUD Supp. Mem. at 4 (citing AR 2268, 2270, 2271, 2278); see also id. at 4-5 (noting that under related regulations, a project "conversion" consists of "the transfer of the responsibility of administering the Contract") (citing 40 Fed. Reg. 18682, 18683 ¶ 15 (Apr. 29, 1975)). Plaintiffs counter that 24 C.F.R. § 880.505(c) calls for a more formalized conversion process which HUD has not followed, and is therefore irrelevant to this bid protest. AHSC Supp. Mem. at 5-6. Although the Court finds that section 880.505(c) is somewhat ambiguous on this point, it agrees with HUD that the agency's initiation of the PBCA program pursuant to the 1999 RFP, and subsequent execution of the PBACCs with chosen PHAs, were sufficiently formalized mechanisms that met the requirements of subsections (1)-(3) of this regulation. At any rate, the Court holds that, at a minimum, Plaintiffs have failed to demonstrate that HUD's procedure here was a "clear and prejudicial violation of applicable … regulations," as required under this Court's standard of review for bid protests. See Axiom Res. Mgmt., 564 F.3d at 1381.

Finally, Plaintiffs' argue that "[u]nlike a traditional ACC, a PBACC does not actually provide assistance to PHAs or owners. Instead, it provides a fee to contractors to administer the assistance that HUD is already obligated to provide." CMS Reply at 4-5. In essence, Plaintiffs' argument is that, in practice, the role of the PBCAs in administering the HAP contract is merely "ministerial," and therefore primarily for HUD's benefit – and, by extension, necessarily a procurement contract under the standards of the FGCAA. In support of this argument, Plaintiffs repeatedly cite Section 4350.3 of the HUD Handbook ("Occupancy Requirements of Subsidized Multifamily Housing Programs"), subsection 1-4(B) of which provides:

32

HUD has primary responsibility for contract administration but has assigned portions of these responsibilities to other organizations that act as Contract Administrators for HUD. … There are two types of Contract Administrators that assist HUD in performing contract administration functions.

1. <u>Traditional Contract Administrators</u>. These Contract Administrators have been used for over 20 years and have Annual Contribution Contracts (ACCs) with HUD. Under their ACCs, Traditional Contract Administrators are responsible for asset management functions and HAP contract compliance and monitoring functions. They are paid a fee by HUD for their services.

2. <u>Performance-Based Contract Administrators (PBCAs)</u>. The use of PBCAs began as an initiative in 2000. Under a performance-based ACC, the scope of responsibilities is more limited than that of a Traditional Contract Administrator. A PBCA's responsibilities focus on the day-to-day monitoring and servicing of Section 8 HAP contracts. PBCAs are generally required to administer contracts on a state-wide basis and have strict performance standards and reporting requirements as outlined in their ACC.

AR 2492.

The "Traditional Contract Administrators" ("TCAs") referred to here are PHAs that, pursuant to either subsection 8(b)(1) or sentence two of subsection 8(b)(2), entered into ACCs with HUD and, concurrently, HAP contracts with project owners. As the Handbook indicates, and as Plaintiffs stress in their briefs, the authority retained by the TCAs is somewhat more expansive than that held by the PBCAs pursuant to the PBACCs. For example, under the PBACCs, HUD retains the responsibility to determine when project owners are in default, 24 C.F.R. § 880.506(a); AR 20201, and is the only party capable of terminating a HAP contract, 24 C.F.R. § 880.506(b). In addition, although the PBCAs sign the HAP contracts as the Contract Administrator on HUD's behalf, since 2007 HUD has also signed every renewal HAP contract because, in the determination of HUD counsel, these contracts "represent the official point of obligation of federal funds." <u>See</u> Docket No. 57-2 at 3 (email from Lanier Hylton dated November 20, 2007); <u>see</u> <u>also</u> Order dated February 19, 2013 (granting motions to supplement the administrative record, including with the Hylton email).

The Court acknowledges the limitations on the authority of the PBCAs and HUD's continued oversight role in the administration of the PBCA program. However, in light of the statutory and regulatory scheme analyzed above, the Court finds that such

limitations fall well short of establishing that the PBCA program primarily benefits HUD, rather than serving as a mechanism through which HUD, in cooperation with the states, carries out the statutorily authorized goal of supporting affordable housing for low-income individuals and families.

First, as HUD points out, since its enactment in 1937, the stated policy of the Housing Act has been for HUD and its predecessor agencies to work cooperatively with states and their political subdivisions to promote various housing and community development-related goals. As originally enacted, the Housing Act's "Declaration of Policy" provided that:

> It is hereby declared to be the policy of the United States to promote the general welfare of the Nation by employing its funds and credit, as provided in this Act, to *assist the several states and their political subdivisions* to … remedy the unsafe and insanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of low income, in rural or urban communities, that are injurious to the health, safety, and morals of the citizens of the Nation.

Pub. L. No. 75-412, 50 Stat. 888 (1937) (emphasis added); see also id. (preamble, stating the purpose of the Act to be the provision of "*financial assistance to States and political subdivisions thereof* for the elimination of unsafe and insanitary housing conditions, for the eradication of slums, for the provision of decent, safe, and sanitary dwellings for families of low income …") (emphasis added).

In 1998 Congress somewhat modified this policy statement. It currently reads:

(a) Declaration of Policy – It is the policy of the United States –

    (1) to promote the general welfare of the Nation by employing the funds and credit of the Nation, as provided in this Act –

      (A) *to assist States and political subdivisions of States* to remedy the unsafe housing conditions and the acute shortage of decent and safe dwellings for low-income families;

      (B) *to assist States and political subdivisions of States* to address the shortage of housing affordable to low-income families; and

      (C) Consistent with the objectives of this title, to vest in public housing agencies that perform well, the maximum amount of responsibility and flexibility in program administration, with appropriate accountability to public housing residents, localities, and the general public.

34

QHWRA, 112 Stat. 2461, 2522-23 (1998), codified at 42 U.S.C. § 1437 (emphasis added).

HUD contends, and the Court agrees, that these revisions serve to reiterate and "further emphasiz[e] the primary role the states and their political subdivisions are to play" in implementing the federal government's housing policies. HUD Mem. at 14. More important, however, is the fact that the consistent policy of the Housing Act has been for HUD (and its predecessor agencies) to implement federal housing goals through close cooperation and coordination with the states. Moreover, although the Plaintiffs attempt to make much of HUD's various statements throughout the years regarding the cost-saving effects of the PBCA program, see NHC Mem. at 2; SHCC Mem. at 9, the Court finds nothing inconsistent in HUD sharing greater responsibility for program administration with the states while at the same time achieving certain cost efficiencies. Indeed, as HUD points out, such twin goals were expressly set forth in MAHRA, which called on HUD to address "Federal budget constraints … and diminished administrative capacity" through "reforms that transfer and share many of the loan and contract administration functions and responsibilities of the Secretary to and with capable State, local, and other entities." MAHRA § 511(10), (11)(C).

In addition, as HUD correctly points out, it has always limited the award of the PBACCs to PHAs, and has done so under the express reasoning that "[b]y law, HUD may only enter into an ACC with a legal entity that qualifies as a 'public housing agency' (PHA) as defined in the United States Housing Act of 1937." AR 428-29, 64 Fed. Reg. at 27,358-59. Were HUD obtaining the services of the PBCAs strictly for its own "ministerial" convenience, the Court does not see how such a restriction would apply – and, indeed, HUD has stated that were the Court to find that it must issue the PBACCs as procurement contracts, HUD does not believe it would be in the agency's self-interest to continue the restriction going forward. See HUD Supp. Mem. at 8. Thus, the PHA-only rule would appear to make sense only if one conceives of these entities as HUD's governmental partners in the administration of housing programs intended to convey a benefit to low-income families and individuals. And, as HUD notes, consistent with such a design, the PBCA program is in fact "administered by a program office, not a contracting officer. … [and] all statutory amendments and changes in policies or procedures [to the program] have been implemented not through a FAR-mandated changes clause, but through notices, handbooks, and regulations." HUD Mem. at 20.

- The PBACCs are Consistent With the Standards for Cooperative Agreements Set Forth in the FGCAA.

As explained above, the FGCAA establishes a "principal purpose" test for the determination of whether a particular governmental contract is properly categorized as a procurement contract or a cooperative agreement. When "the principal purpose of the

instrument is to acquire (by purchase, lease, or barter) property or services *for the direct benefit of the United States Government*," an agency must use a procurement contract. 31 U.S.C. § 6303 (emphasis added). Conversely, when (1) "the principal purpose of the relationship is to *transfer a thing of value*" to the recipient in order "*to carry out a public purpose of support or stimulation authorized by a law* of the United States," and (2) "*substantial involvement* is expected between the executive agency and the State, local government, or other recipient when carrying out the activity contemplated in the agreement," the agency may use an assistance agreement. Id. § 6305 (emphasis added).

Citing these standards, the Government argues that the contracts in question hew much more closely to the latter definition. Specifically, HUD posits that it "has not and is not acquiring any services when it grants administrative authority and transfers funds to PHAs via the ACCs," but "[r]ather … is engaged in a core statutory duty of providing funding assistance to state-sponsored PHAs[.]" HUD Mem at 22. Moreover, HUD argues that it "has retained authority to make certain decisions [and] to control the administration of the program … to ensure that Federal funds are spent in strict accordance with the terms of the HAP contracts and Federal law," which dovetails with the FGCAA's instruction that "substantial involvement" on the part of the Government is indicative of a cooperative agreement, not a procurement contract. Id. at 32.

The Court agrees with HUD that the PBACCs are properly categorized as cooperative agreements under the standards set forth in the FGCAA. Notwithstanding the fact that HUD originally directly administered the majority of the HAP contracts in the 2012 NOFA portfolio, it is unburdened by any statutory or regulatory obligation to maintain this responsibility in going forward in perpetuity. When MAHRA authorized HUD to renew the expiring HAP contracts, it did not specify any particular model for HUD to use in providing the renewal assistance. Consistent with the policy goals set forth in the Housing Act, HUD instituted the PBCA program and, in so doing, enlisted the states and their political subdivisions, the PHAs, to take on greater program responsibility. That HUD achieved certain cost savings in so doing does not convert the PBCA program into a procurement process that primarily benefits HUD, as opposed to the recipients of the Section 8 assistance.

III.     Motions to Supplement the Administrative Record

Finally, the Court will briefly address two post-argument motions to supplement the administrative record, made by Plaintiffs NHC and AHSC. Each of these Plaintiffs seeks to have the Court admit a two-page February 7, 2007 HUD memorandum outlining certain procedures in HUD's transfer of HAP contracts from the PHAs that had originally (or "traditionally") administered them, to the PHA that was serving as the PBCA with jurisdiction for the geographic area in which certain projects were located. See Docket Entry 90-2 (the February 7, 2007 memorandum). HUD opposes these motions, arguing that they are untimely; that the memorandum is not "necessary to permit meaningful

judicial review," per the standard established in <u>Axiom Resource Management, Inc. v. United States</u>, 564 F.3d 1374, 1379 (Fed. Cir. 2009); and that, in any event, the memorandum actually supports its position.

The Court agrees with HUD that, in a case as extensively briefed and with an administrative record as large as this one, the February 7, 2007 memorandum cannot meet the <u>Axiom</u> standard for supplementation. It also agrees with HUD that, for the reasons the Court will not belabor but which follow from its above analysis, the memorandum neither undermines nor contradicts the Government's position in this case. The Court therefore DENIES these motions.

Conclusion

For the reasons stated herein, the Court finds that the 2012 NOFA properly characterizes the PBACCs as cooperative agreements. The NOFA is compliant with the FGCAA, and is not subject to CICA. Accordingly, the Court DENIES HUD's motion to dismiss for lack of subject matter jurisdiction; DENIES the Plaintiffs' respective motions for judgment on the administrative record; and GRANTS HUD's motion for judgment on the administrative record. In addition, the Court DENIES Plaintiffs NHC and AHSC's motions to supplement the administrative record.

No costs.

IT IS SO ORDERED.

s/ Thomas C. Wheeler
THOMAS C. WHEELER
Judge

# In the United States Court of Federal Claims

No. 12-852C (and consolidated cases)

(Filed: April 22, 2013)

```
*****************************************  *
                                           *
CMS CONTRACT MANAGEMENT                    *
SERVICES, et al.,                          *
                                           *
                        Plaintiffs,        *
                                           *
v.                                         *
                                           *
THE UNITED STATES,                         *
                                           *
                        Defendant.         *
                                           *
*****************************************  *
```

## ORDER

On April 19, 2013, the Court issued an opinion and order in the above-captioned case, holding that a certain 2012 Notice of Funding Availability ("NOFA") issued by the U.S. Department of Housing and Urban Development ("HUD") "is compliant with the FGCAA" (*i.e.*, the Federal Grant and Cooperative Agreement Act, 31 U.S.C. §§ 6301-6308), and "not subject to CICA" (*i.e.*, the Competition in Contracting Act, 41 U.S.C. § 3301). Docket Entry 98 (Order and Opinion) at 37 (emphasis added). Accordingly, the Court granted judgment on the administrative record to HUD, and denied various remaining motions on the merits of this case.

Later that same day, Plaintiffs CMS Contract Management Services and the Housing Authority of the City of Bremerton (collectively, "CMS") filed a motion for clarification of this decision, as well as a motion to stay the Court's decision. With respect to the former, CMS appears to seek clarification as to whether the Court's holding that the NOFA "is compliant with the FGCAA" applies to a provision in the NOFA that creates an in-state preference for the award of the contracts at issue in this case. It does. The FGCAA establishes only a precatory goal that agencies "encourage competition in making grants and cooperative agreements"; nothing in this Act mandates, as does the CICA, "full and open competition." 41 U.S.C. § 3301(a)(1). Moreover, the contracts in

the NOFA portfolio are "performance-based," and thus will, in fact, be awarded competitively, pursuant to numerous indicia specified in the terms of the NOFA.

With respect to CMS's second request, for a stay of the Court's decision pending appeal, the Court notes only that a likelihood of success on the merits is a necessary component of a party's entitlement to such relief.  Hallmark-Phoenix 3, LLC v. United States, 429 F. App'x 983, 984 (Fed. Cir. 2011).  For the reasons explained in detail in the Court's April 19, 2013 Opinion and Order, the Court finds that CMS cannot establish such a likelihood, and therefore DENIES this motion.

IT IS SO ORDERED.

s/ Thomas C. Wheeler
THOMAS C. WHEELER
Judge

# In the United States Court of Federal Claims

**Nos. 12-852 C, 12-853 C, 12-862 C,**
**12-864 C and 12-869 C**

| | |
|---|---|
| **CMS CONTRACT MANAGEMENT SERVICES and THE HOUSING AUTHORITY OF THE CITY OF BREMERTON, ET AL.**<br>          **Plaintiffs** | |
| **and** | |
| **MASSACHUSETTS HOUSING FINANCE AGENCY**<br>          **Plaintiff-Intervenor** | **JUDGMENT** |
| **v.** | |
| **THE UNITED STATES**<br>          **Defendant** | |

Pursuant to the court's Opinion and Order, filed April 19, 2013, denying defendant's motion to dismiss for lack of subject matter jurisdiction, and granting defendant's alternative motion for judgment on the administrative record, and the court's Order directing entry of judgment, filed April 19, 2013,

IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that judgment is entered in favor of defendant.

Hazel C. Keahey
Clerk of Court

**April 30, 2013**          By:    s/ Debra L. Samler

Deputy Clerk

NOTE: As to appeal, 60 days from this date, see RCFC 58.1, re number of copies and listing of all plaintiffs.  Filing fee is $455.00.